**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SARAH PRESTON,
　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

LARRY LEAKE, in his official
capacity as Chairman of the North
Carolina State Board of Elections;
CHARLES WINFREE, in his official
capacity as a Member of the North
Carolina State Board of Elections;
ROBERT CORDLE, in his official
capacity as a Member of the North
Carolina State Board of Elections;
ANITA S. EARLS, in her official
capacity as Secretary of the North
Carolina State Board of Elections;
BILL W. PEASLEE, in his official
capacity as a Member of the North
Carolina State Board of Elections,
　　　　　　*Defendants-Appellees.*

No. 10-2294

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Louise W. Flanagan, Chief District Judge.
(5:08-cv-00397-FL)

Argued: September 21, 2011

Decided: November 7, 2011

Before NIEMEYER and KING, Circuit Judges, and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge King and Senior Judge Hamilton joined.

---

**COUNSEL**

**ARGUED:** Thomas Hamilton Segars, ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellant. Susan Kelly Nichols, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF**: Jonathan D. Sasser, ELLIS & WINTERS, LLP, Raleigh, North Carolina; Katherine L. Parker, Raleigh, North Carolina, for Appellant. Roy Cooper, Attorney General, Alexander McC. Peters, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

Sarah Preston, a North Carolina registered lobbyist, commenced this action under 42 U.S.C. § 1983 against the North Carolina State Board of Elections to challenge the constitutionality—facially and as applied—of North Carolina's "Campaign Contributions Prohibition," N.C. Gen. Stat. § 163-278.13C(a) (2011), which prohibits any registered lobbyist from contributing to the campaign of any candidate for the North Carolina General Assembly or the Council of State. Preston, who asserts that she desires to make small campaign

contributions and to volunteer for candidates, alleges that the statute violates her rights to freedom of speech and freedom of association guaranteed by the First and Fourteenth Amendments.

In a thorough opinion, the district court rejected the challenge, finding that the statute served the important governmental interest of avoiding corruption and the appearance of corruption while leaving open other sufficient means for political expression by lobbyists. The court concluded that the statute was constitutional both on its face and as applied to Preston.

We affirm. Applying the "closely drawn" standard of scrutiny that we conclude is applicable to such contribution restrictions, we hold that the statute is constitutional, both facially and as applied to Preston, as a valid exercise of North Carolina's legislative prerogative to address potential corruption and the appearance of corruption in the State.

I

In 2006, North Carolina enacted the Campaign Contributions Prohibition, which prohibits registered lobbyists from making contributions to candidates for the North Carolina General Assembly and the Council of State. 2006 N.C. Sess. Laws 201; N.C. Gen. Stat. § 163-278.13C(a). The Campaign Contributions Prohibition, as well as the other provisions of the State Government Ethics Act, of which the Campaign Contributions Prohibition is a part, was enacted "to ensure that elected and appointed state agency officials exercise their authority honestly and fairly, free from impropriety, threats, favoritism, and undue influence." 2006 N.C. Sess. Laws 201. North Carolina asserts that, in enacting the provision, it was responding to a "crisis of confidence in State government," resulting from corruption and the appearance of corruption over the last decade. Brief of Appellee at 2. As the State relates the history:

Former North Carolina Commissioner of Agriculture, Meg Scott Phipps. Former Speaker of the North Carolina House of Representatives, Jim Black. Former North Carolina Representatives, Michael Decker and Thomas Wright. These were North Carolina elected officials embroiled in campaign finance scandals leading to convictions in federal and state courts, and, in one instance, expulsion from the North Carolina House of Representatives. Chiropractors, optometrists, high-profile registered lobbyist Don Beason, and others—including most recently the campaign committees of former governor Michael F. Easley and current governor Bev Perdue—have also been part of the corruption or appearance of corruption that has infected North Carolina's state government in the last decade.

*Id.*

The Campaign Contributions Prohibition provides in relevant part:

> (a) No lobbyist may make a contribution as defined in G.S. 163-278.6 to a candidate or candidate campaign committee as defined in GS 163-278.38Z when that candidate meets any of the following criteria:
>
>> (1) Is a legislator as defined in G.S. 120C-100.
>>
>> (2) Is a public servant as defined in G.S. 138A- 3(30)a. and G.S. 120C-104.

N.C. Gen. Stat. § 163-278.13C(a). The statute defines "contribution," which lies at the center of this appeal, as follows:

> [A]ny advance, conveyance, deposit, distribution, transfer of funds, loan, payment, gift, pledge or sub-

scription of money or anything of value whatsoever, made to, or in coordination with, a candidate to support or oppose the nomination or election of one or more clearly identified candidates, to a political committee, to a political party, or to a referendum committee, whether or not made in an election year, and any contract, agreement, or other obligation to make a contribution. An expenditure forgiven by a person or entity to whom it is owed shall be reported as a contribution from that person or entity. These terms include, without limitation, such contributions as labor or personal services, postage, publication of campaign literature or materials, in-kind transfers, loans or use of any supplies, office machinery, vehicles, aircraft, office space, or similar or related services, goods, or personal or real property. These terms also include, without limitation, the proceeds of sale of services, campaign literature and materials, wearing apparel, tickets or admission prices to campaign events such as rallies or dinners, and the proceeds of sale of any campaign-related services or goods. Notwithstanding the foregoing meanings of "contribution," the word shall not be construed to include services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate, political committee, or referendum committee. The term "contribution" does not include an "independent expenditure." If:

> a. Any individual, person, committee, association, or any other organization or group of individuals, including but not limited to, a political organization (as defined in section 527(e)(1) of the Internal Revenue Code of 1986) makes, or contracts to make, any disbursement for any electioneering communication, as defined in this section; and

b. That disbursement is coordinated with a candidate, an authorized political committee of that candidate, a State or local political party or committee of that party, or an agent or official of any such candidate, party, or committee

that disbursement or contracting shall be treated as a contribution to the candidate supported by the electioneering communication or that candidate's party and as an expenditure by that candidate or that candidate's party.

N.C. Gen. Stat. § 163-278.6.

The statute thus considers "anything of value whatsoever" to be a contribution, excluding specifically volunteer services and independent expenditures. But an individual may not claim to be making an independent expenditure if it is "coordinated with a candidate" or other campaign entity. If the individual does coordinate expenditures, they become contributions. *See id.* Under the Campaign Contributions Prohibition, a lobbyist may also make recommendations to third parties regarding contributions to specific candidates as long as the lobbyist does not act as the collection agent or "bundler" for those contributions. N.C. Gen. Stat. § 163-278.13C(b).

The North Carolina State Board of Elections ("the Board") enforces the Campaign Contributions Prohibition by conducting investigations of alleged violations, *id.* § 163-278.22(7); assessing and collecting civil penalties of up to three times the amount of an unlawful contribution, *id.* §§ 163-278.22(14), 163-278.34(b); and reporting violations of the Campaign Contributions Prohibition to the district attorney for possible criminal prosecution, *id.* § 163-278.27(b). The Board is also authorized to issue advisory opinions to candidates or other entities seeking an interpretation of the statute, *id.* § 163-

278.22(15), and the candidates' or other entities' compliance with any such opinion will absolve them of any potential civil or criminal liability, *id.* § 163-278.23. To date, the Board has issued a number of advisory opinions in order to clarify conduct not explicitly covered by the law, determining, *e.g.*, that a lobbyist may lawfully (1) contribute to a political action committee ("PAC"), even PACs that in turn contribute to candidates; (2) make recommendations to a PAC about which candidates to support, so long as the lobbyist is not the "decisionmaker" as to which candidate receives contributions by exercising unilateral discretion or casting the determinative vote; and (3) attend or host fundraising events in the lobbyist's home so long as the lobbyist does not pay for anything or is reimbursed for any expenditures.

The Board also polices the boundary between what constitutes a "contribution" and what constitutes an "independent expenditure," as defined by the statute, determining on a case-by-case basis the extent to which there is "coordination" between the lobbyist's expenditures and a candidate or campaign. To assist it in this effort, the Board sought "clear instruction" from the General Assembly regarding the proper definition of "coordination," and, in response, the General Assembly enacted an amendment to the Campaign Contributions Prohibition defining "coordination" as "in concert or cooperation with, or at the request or suggestion of." 2010 N.C. Sess. Laws 170, codified at N.C. Gen. Stat. § 163-278.6(6h) (2011).

Sarah Preston in her role as a registered lobbyist commenced this action against the Board, asserting in her complaint "that North Carolina General Statutes § 163-278.13C(a) (the 'Campaign Contribution[s] Prohibition') is unconstitutional, both facially and as applied to [her], in that it infringes on rights to freedom of speech and freedom of association guaranteed by the First and Fourteenth Amendments to the United States Constitution." She claims that she wishes to make nominal campaign contributions of not more than $25

to express her support for legislative candidates of her choice but has refrained from doing so because of the Campaign Contributions Prohibition. She also claims that she wishes to volunteer for local campaigns and to put out a yard sign indicating her support for a particular candidate but is confused about which of her desired actions would constitute campaign contributions, in violation of the Campaign Contributions Prohibition. Preston seeks declaratory and injunctive relief.

After preliminarily determining that "closely drawn" scrutiny was to apply to its evaluation of the statute, *Preston v. Leake*, 629 F. Supp. 2d 517 (E.D.N.C. 2009) ("*Preston I*"), the district court entered summary judgment in favor of the Board, upholding the constitutionality of the Campaign Contributions Prohibition, *Preston v. Leake*, 743 F. Supp. 2d 501 (E.D.N.C. 2010) ("*Preston II*"). In its opinion, the court concluded:

> In light of the sufficiently important interest in avoiding corruption and the appearance of corruption caused by campaign contributions by lobbyists to candidates for statewide office, and with sufficient means for political expression left open to these lobbyists, the Campaign Contributions Prohibition is closely drawn to match a sufficiently important interest.

*Id.* at 511. From the district court's judgment, dated October 19, 2010, Preston filed this appeal.

II

Preston acknowledges that it is appropriate to apply "closely drawn" scrutiny when evaluating laws imposing contribution *limits*, but she contends that a *complete ban* on campaign contributions "restricts direct speech rights of would-be contributors that lie at the core of political expression" and thus "demand[s] strict scrutiny," citing *Citizens United v. Fed-*

*eral Election Commission*, 130 S. Ct. 876 (2010). She explains that in considering contribution *limits*, courts have typically been focused on speech by someone other than the contributor, namely the recipient who will use the contribution to further debate. The contributor still retains the means of symbolic expression through a contribution within the statutory limit. But an *outright ban*, she argues, disallows "the symbolic and expressive act of contributing in the first place," so that the ban is a "direct restraint on political communication," which is therefore subject to strict scrutiny.

The Board contends that contribution bans are subject to "closely drawn" scrutiny, as first identified in *Buckley v. Valeo*, 424 U.S. 1 (1976), and explicitly applied to a campaign contribution ban in *Federal Election Commission v. Beaumont*, 539 U.S. 146 (2003). It argues that the application of this level of scrutiny to campaign contribution bans remains good law, even after *Citizens United*, decided in 2010.*

In its most recent discussion of campaign finance and the First Amendment, the Supreme Court reaffirmed the existence of the two levels of scrutiny by which it has measured campaign finance restrictions. Although the Court reiterated the general principle that "'[l]aws that burden political speech are' . . . 'subject to strict scrutiny,'" *Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) (quoting *Citizens United*, 130 S. Ct. at 898), it also recognized that "[a]t the same time, we have subjected strictures on campaign-related speech that we have found less onerous to a lower level of scrutiny and upheld those restrictions . . . after finding that the restriction at issue was 'closely

---

*Both parties make alternative arguments. Preston argues alternatively that even when the statute is considered under "closely drawn" scrutiny, it is unconstitutional, and the Board argues alternatively that even applying a level of strict scrutiny, the statute is nonetheless constitutional. Of course, the parties' alternative arguments do not resolve the question.

drawn' to serve a 'sufficiently important interest,'" *id.* (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387-88 (2000), and *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 136 (2003), *overruled on other grounds by Citizens United*, 130 S. Ct. at 913). One of the strictures that fell into the "closely drawn" standard was a "government-imposed limit[ ] on contributions to candidates." *Id.* (citing *Buckley v. Valeo*, 424 U.S. 1, 23-25 (1976)).

Despite the fact that "[p]recision about the relative rigor of the standard to review contribution limits was not a pretense of the *Buckley per curiam* opinion," *Nixon*, 528 U.S. at 386, *Buckley* nonetheless laid the foundation for what has been termed "closely drawn scrutiny," *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 291 (4th Cir. 2008) ("*NCRL II*"). The *Buckley* Court explained why a limit on contributions should be subject to this lower standard:

> A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Buckley*, 424 U.S. at 21. The Court later emphasized the distinction between limitations on *contributions* and limitations on *independent expenditures*, when, in *Nixon*, it summarized *Buckley* as standing for the proposition that a lower level of scrutiny is applicable to contribution limits because "limiting contributions le[aves] communication significantly unimpaired." *Nixon*, 528 U.S. at 387. The *Nixon* Court also

addressed specifically the impact of contribution limits on the First Amendment right to associate freely:

> While an expenditure limit 'precludes most associations from effectively amplifying the voice of their adherents,' (thus interfering with the freedom of the adherents as well as the association), the contribution limits 'leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates.'

*Id.* (quoting *Buckley*, 424 U.S. at 22) (internal citation omitted).

As it now stands, the level of scrutiny applicable to any restriction on political financial activity that implicates the First Amendment is "based on the importance of the 'political activity at issue' to effective speech or political association." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003) (quoting *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 259 (1986)). And because contribution limits are "merely 'marginal' speech restrictions" and "lie closer to the edges than to the core of political expression," they are "subject to relatively complaisant review under the First Amendment." *Beaumont*, 539 U.S. at 161.

Preston takes no issue with this jurisprudence generally. Rather, she contends that the Campaign Contributions Prohibition, because it is an absolute ban, infringes not "marginal" speech but core political speech and association. She points out that the only contribution *ban* to which the Supreme Court has applied closely drawn scrutiny was the ban on *corporate* contributions upheld in *Beaumont*. But she argues that *Beaumont* is distinguishable from this case because the Court in *Beaumont* determined that closely drawn scrutiny should apply, in part, because that case involved "[a] ban on direct corporate contributions leav[ing] individual members of cor-

porations free to make their own contributions." 539 U.S. at 162 n.8. The North Carolina Campaign Contributions Prohibition, by contrast, directly forbids individual lobbyists from making any contributions.

Preston also argues that *Buckley* recognized an individual's continued ability to make a "symbolic contribution" as one reason that a contribution limit was a marginal restriction on speech. *See Buckley*, 424 U.S. at 21. It follows, Preston reasons, that a law that forbids even such a symbolic contribution should be subject to a higher level of scrutiny. She argues that contribution limits "b[ear] more heavily on the associational right than on freedom to speak," *Nixon*, 528 U.S. at 388, and that the Campaign Contributions Prohibition at issue here appears to impact directly an individual lobbyist's ability to exercise that right.

Although Preston's arguments have some initial appeal, upon closer review, we find them unpersuasive. The Supreme Court has made clear that the level of scrutiny to be applied in these cases depends on the political activity at issue. In articulating her position, Preston essentially argues that the examination of the political activity in this case should lead us to reject the expenditure/contribution dichotomy where a ban is concerned. The Supreme Court, however, adopted this dichotomy precisely because these categories of political expression represent two distinct types of political activity. *See Nixon*, 528 U.S. at 386-89. While a symbolic contribution to a candidate's campaign is undoubtedly political expression protected by the First Amendment, the prohibition of this particular expressive activity is "less onerous," *see Ariz. Free Enterprise*, 131 S. Ct. at 2817, because of the numerous other ways in which would-be contributors can associate with particular candidates and express their political viewpoints, *Nixon*, 528 U.S. at 386-89. The imposition of a restriction, whether a limit or a ban, on contributions by a specific group of individuals serves only as a channeling device, cutting off the avenue of association and expression that is most likely to

lead to corruption but allowing numerous other avenues of association and expression. In contrast to these narrow restrictions, a generally applicable *expenditure* limit serves as a muzzling device, cutting off altogether political speech above a certain level.

Although a ban ends association rights to a greater degree than does a limit by foreclosing the ability to make even a small donation, this amounts to a difference *in the scope* of a particular law, not a difference in the type of activity regulated by the law. Thus, the Supreme Court rejected a version of Preston's argument in *Beaumont* with regard to a complete ban on corporate contributions, saying that the argument "overlooks the basic premise" that the level of scrutiny depends on the activity regulated. *Beaumont*, 539 U.S. at 161. This is not to say that the difference in scope between a ban and a limit should be ignored. But it does mean that "the time to consider it is when *applying* scrutiny at the level selected, not in selecting the standard of review itself." *Id.* at 162 (emphasis added); *see also Green Party of Conn. v. Garfield*, 616 F.3d 189, 199 (2d Cir. 2010) (rejecting the argument that a ban on lobbyists contributions should be subjected to strict scrutiny); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1124 n.4 (9th Cir. 2011) (rejecting the argument that a ban deserves higher scrutiny than a limit).

Preston argues further that *Citizens United*, decided in 2010, eliminated "closely drawn" scrutiny with its unqualified statement that "law[s] that burden political speech are 'subject to strict scrutiny.'" 130 S. Ct. at 898 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)). But the *Citizens United* Court also recognized explicitly that the plaintiff in that case "ha[d] not made direct contributions to candidates [and] ha[d] not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny." *Id.* at 909. In addition, the Court in *Arizona Free Enterprise*, decided after *Citizens United*, reaffirmed the continuing

existence of the dual levels of scrutiny. *Ariz. Free Enterprise*, 131 S. Ct. at 2816-17.

We thus conclude that the Supreme Court has not overruled *Buckley*, *Nixon*, *Beaumont*, or other cases applying "closely drawn" scrutiny to contribution restrictions, and in doing so, we join the other circuits that have concluded similarly. *See Garfield*, 616 F.3d at 199; *Siefert v. Alexander*, 608 F.3d 978, 988 (7th Cir. 2010); *In re Cao*, 619 F.3d 410, 422-23 (5th Cir. 2010). Accordingly, we affirm the district court's conclusion that in reviewing the Campaign Contributions Prohibition, we must determine whether it is closely drawn to a sufficiently important government interest.

### III

In support of her challenge to the constitutionality of the Campaign Contributions Prohibition *as applied* to her, Preston states that she seeks to make campaign contributions of "no more than $25," to volunteer for local campaigns without having to account for small expenses, and to put out a yard sign expressing support for a candidate. She maintains that her engaging in these activities would result in no actual corruption but that prohibiting them "extinguishes her right to make a symbolic expression of support for her candidate of choice." In addition, she argues that she cannot volunteer "without fear that some unaccounted for expense will generate a [damaging] headline" about her or the candidate she supports. *See Randall v. Sorrell*, 548 U.S. 230, 260 (2006) (plurality opinion).

The Board claims that the record in this case shows "absolutely no application" of the Campaign Contributions Prohibition to Preston and that Preston has not offered any authority for the proposition that her "inchoate desire, without any government action, constitutes application of the statute to her." In addition, the Board argues that the activities prohibited by the statute are clear and that Preston has no reason to refrain

from her desired activities out of confusion regarding the statute's application.

The government does not, however, take issue with the fact that Preston faces a "credible threat of prosecution" should she donate money or otherwise violate the Campaign Contributions Prohibition, thus giving her standing to mount an as-applied challenge to the statute. *See N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) ("*NCRL I*") (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). In addition, we have held a law that "'facially restrict[s] expressive activity by the class to which the plaintiff belongs' presents such a credible threat [of prosecution]." *Id.*; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1339 n.7 (2010) (hearing an as-applied pre-enforcement challenge based only on the status of the plaintiffs, despite the absence of exhibits or other evidence to "ground [the] analysis"). As we noted, such a presumption "is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *NCRL I*, 168 F.3d at 710.

That brings us to the question whether the restrictions on Preston's political activities and the potential chilling effect on her expressive activities are closely drawn to serve a sufficiently important state interest.

North Carolina asserts, and Preston agrees, that the Campaign Contributions Prohibition serves a sufficiently important state interest in preventing both actual corruption and the appearance of corruption. *See Buckley*, 424 U.S. at 25; *Citizens United*, 130 S. Ct. at 908-09; *NCRL II*, 525 F.3d at 281; *see also McConnell*, 540 U.S. at 143 ("Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits"). Rather, Preston's challenge to the statute centers on her assertion that it is *not closely drawn* to serve that important state interest because the North Carolina legis-

lature could have allowed for the small donations that she would like to make without undermining its interest in preventing actual and perceived corruption.

To be sure, the Campaign Contributions Prohibition extinguishes "one aspect of the contributor's freedom of political association," *Randall*, 548 U.S. at 246 (quoting *Buckley*, 424 U.S. at 24), whereas a limit would allow Preston to make a symbolic expression of support "through a small contribution." But we do not find this difference, in the circumstances presented, to be sufficiently great as to render the contribution ban unconstitutional. This is especially so in light of the strong state interest served by the ban.

Responding to its recent scandals, the North Carolina legislature enacted the ban, explaining that "elected and appointed officials must maintain and exercise the *highest standards* of duty to the public in carrying out the responsibilities and functions of their positions." 2006 N.C. Sess. Laws 201 (emphasis added). The legislature thus made the rational judgment that a complete ban was necessary as a prophylactic to prevent not only actual corruption but also the appearance of corruption in future state political campaigns. This is both an important and a legitimate legislative judgment that "[c]ourts simply are not in the position to second-guess," especially "where corruption is the evil feared." *NCRL I*, 168 F.3d at 716 (quoting *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982)). As we have explained:

> Unsurprisingly, the strength of the state's interest in preventing corruption is highly correlated to the nature of the contribution's recipient. Thus, the state's interest in the prevention of corruption—and, therefore, its power to impose contribution limits—is strongest when the state limits contributions made directly to political candidates.

*NCRL II*, 525 F.3d at 291. And this formulation has been cited with approval. *See Long Beach Area Chamber of Commerce*

*v. City of Long Beach*, 603 F.3d 684, 696 (9th Cir. 2010). One can hardly imagine another interest more important to protecting the legitimacy of democratic government.

We also conclude that in aiming the ban at only lobbyists, who, experience has taught, are especially susceptible to political corruption, North Carolina closely drew its enactment to serve the state interests it identified. The role of a lobbyist is both legitimate and important to legislation and government decisionmaking, but by its very nature, it is prone to corruption and therefore especially susceptible to public suspicion of corruption. *Any payment* made by a lobbyist to a public official, whether a campaign contribution or simply a gift, calls into question the propriety of the relationship, and therefore North Carolina could rationally adjudge that it should ban *all* payments. Indeed, it is for these very reasons that we upheld North Carolina's prior statute imposing a total ban on lobbyists' contributions, albeit only during campaigns while the General Assembly was in session. *See NCRL I*, 168 F.3d at 716 (holding that a restriction on contributions by lobbyists survived strict scrutiny, in part, because it was "limited to lobbyists and the political committees that employ them"); *cf. Garfield*, 616 F.3d at 205 ("Thus, although the CFRA's ban on contractor contributions is a drastic measure, it is an appropriate response to a specific series of incidents that have created a strong appearance of corruption with respect to all contractor contributions").

In support of her argument that a limitation, as distinct from an outright ban, should have been imposed, Preston relies on the Second Circuit's decision in *Garfield*. While *Garfield* did make the observation that a ban should not be imposed if a limitation would suffice, *see Garfield*, 616 F.3d at 206, the court nonetheless upheld a *ban* on contributions by contractors and their families as a closely drawn exercise of legislative power because Connecticut had demonstrated that its recent corruption scandals "created an appearance of corruption with respect to *all* exchanges of money between state

contractors and candidates for state office." *Id.* With respect to Connecticut's ban on lobbyist contributions, however, the *Garfield* court concluded that Connecticut had presented insufficient evidence to support the ban, especially a ban so broad, prohibiting (1) contributions from lobbyists, (2) contributions from lobbyists' spouses and dependent children, (3) solicitations of contributions by lobbyists, and (4) attendance at campaign fund raisers. *Id.* at 195-96, 207.

But with North Carolina's stated experience with corruption and its decision to impose the "highest standards," we find no reason to second-guess the legislative judgment that a ban on all contributions from lobbyists was the best response. For the purposes identified by North Carolina, we conclude that the Campaign Contributions Prohibition is closely drawn to meet the perceived problem.

With respect to Preston's wish to display a yard sign in support of a candidate and to volunteer for a candidate's campaign, the Campaign Contributions Prohibition does not prohibit either activity. In addition, with respect to Preston's wish to be a campaign volunteer, she has offered no details about her specific activities to which the Campaign Contributions Prohibition would apply. Her stated fears about overlooking small expenses while volunteering are "phrased at such a high level of generality that they cannot prevail in this preenforcement challenge." *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2729 (2010).

Because we conclude that, based on the record before us, the Campaign Contributions Prohibition is constitutional as applied to Preston, we will next consider whether the statute is facially overbroad. *See United States v. Stevens*, 130 S. Ct. 1577, 1593-94 (2010) (Alito, J., dissenting) ("[I]t is not the usual judicial practice . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily— that is, before it is determined that the statute would be valid as applied" (quoting *Bd. of Trustees of State Univ. of N.Y. v.*

*Fox*, 492 U.S. 469, 484-85 (1989))); *see also NCRL II*, 525 F.3d at 286.

## IV

Preston contends that the Campaign Contributions Prohibition is facially unconstitutional as overly broad because it "provides no limiting exceptions"; it "does not leave open alternative means for lobbyists to participate in First Amendment activities"; and it is not "tailored in any degree to serve its stated government interest of avoiding corruption or the appearance of corruption."

Any facial challenge to a legislative enactment that tests the enactment not only as applied to the plaintiff but also as applied to other unidentified persons, must be treated cautiously by Article III courts because "slipping into the embrace of a facial challenge can tend to leave behind the limitations imposed by Article III and . . . to trample on legislative prerogatives, in violation of separation of powers principles." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 173 (4th Cir. 2009). Despite the fact that "passing on the validity of a law wholesale may be efficient in the abstract," the broad resolution of a facial challenge denies the judicial system the "lessons taught by the particular, to which common law method normally looks." *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 608-09 (2004)).

Outside of the First Amendment context, a facial challenger can only succeed by "establish[ing] that no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or by demonstrating that a statute has no "plainly legitimate sweep," *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring in the judgments).

But in the First Amendment context, the fear of chilling expressive rights has led courts to entertain facial challenges

based merely on hypothetical applications of the law to non-parties, even though such an approach is "contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring) (internal quotation marks omitted)). Thus, in the First Amendment context, the Supreme Court has "recognize[d] 'a second type of facial challenge,'" which is evaluated under a standard that inquires whether a "'substantial number of [a statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 130 S. Ct. at 1587 (2010) (quoting *Wash. State Grange*, 552 U.S. at 449 n.6). This overbreadth doctrine thus allows a party to challenge a law facially under the First Amendment by "describ[ing] [a substantial number of] instances of arguable overbreadth of the contested law" even if the law is constitutional as applied to the plaintiff. *Wash. State Grange*, 552 U.S. at 449 n.6; *see also Stevens*, 130 S. Ct. at 1593 (Alito, J., dissenting) ("Because an overly broad law may deter constitutionally protected speech, the overbreadth doctrine allows a party to whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others"); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 483 (1989) ("Ordinarily, the principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application to *someone else*").

In sum, when assessing an overbreadth challenge, we must construe the statute and determine whether "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 130 S. Ct. at 1587 (quoting *Wash. State Grange*, 552 U.S. at 449

n.6). And in construing the statute, we give deference to the State's interpretation of the statute. *Cf. id.* at 1587-88.

The Campaign Contributions Prohibition in this case provides simply that "[n]o lobbyist may make a contribution . . . to a candidate or candidate campaign . . . when that candidate . . . [i]s a legislator . . . [or] a public servant." N.C. Gen. Stat. § 163-278.13C(a). While almost all of the terms in the Prohibition are defined by the statute, the critical term, which gives the statute its purportedly unconstitutional breadth, is the term "contribution." A contribution includes "anything of value whatsoever," and the ban is not temporally limited, nor is there a *de minimis* exception. *Id.* § 163-278.6(6). While there is an exception for volunteered services, the term contribution includes expenses incurred even while volunteering if the expenditures are "coordinated" with the campaign. The statute defines "coordination" to mean "in concert or cooperation with, or at the request or suggestion of" the campaign. *Id.* § 163-278.6(6h). If the expenses are not incurred in cooperation with the campaign, they are excluded from the definition of contribution.

Preston focuses on the fact that the Campaign Contributions Prohibition prohibits *all* contributions, regardless of their monetary value, and also, for this reason, creates confusion in determining what expenditures, however small, she may make in coordination with a campaign. She argues that *de minimis* contributions do not corrupt and North Carolina has not provided evidence to suggest that they do. She relies heavily on *Randall*, 548 U.S. 230, which found broadly applicable limits to campaign contributions unconstitutional.

To be sure, in *Randall*, the Supreme Court pointed out that the failure to exclude expenses of volunteers incurred for travel and other minimal expenses from the definition of "contribution" could burden volunteers' efforts on behalf of a campaign. 548 U.S. at 259. The Court also found suspect the broad definition of prohibited contributions, which included

all expenditures "intentionally facilitated by, solicited by, or approved by" the candidate. *Id.* at 238. Thus, the Court observed, the combination of prohibiting a broad range of expenses incurred by volunteers and defining "contribution" to include all coordinated expenditures would burden a campaign and make it "difficult for individuals to associate" with their chosen candidate. *See id.* at 260.

These observations made by the *Randall* Court, however, were in a context that applied much more broadly and directly to volunteers' efforts to support campaigns, potentially "imped[ing] a campaign's ability effectively to use volunteers." *Id.* at 260. But the Court's concern over the statute's impact on volunteers arose because the low contribution limit applied to *all* contributions by *all* individuals, political organizations, and political parties.

The meaningful distinction for purposes of this case is that the Campaign Contributions Prohibition here is limited to lobbyists, a small class of people who might also be volunteers. *See Garfield*, 616 F.3d at 201 (rejecting the applicability of *Randall* to a ban limited to contractors because "*Randall* addressed *general* contribution limits that applied to all citizens"). And even with respect to lobbyists, the Campaign Contributions Prohibition allows volunteering, as it only prohibits volunteer expenses made in coordination with the candidate or the campaign.

Preston freely chose to become a registered lobbyist, and in doing so agreed to abide by a high level of regulatory and ethical requirements focusing on the relationship of lobbyist and public official. In making her choice, she or any other lobbyist covered by the Campaign Contributions Prohibition surely must recognize the potential in such a relationship for corruption and the difficulty of defining any level of contribution that would not tend to corrupt or at least provide the appearance of corruption. The nature of the lobbyists' role in its finest tradition exists in tension with any idea that a lobbyist can

make payments of any kind or in any amount to a public official. The small campaign contribution, just as the small gift, suffers from a legitimate suspicion of corruption, which North Carolina reasonably sought to eliminate, particularly in light of North Carolina's prior scandals.

Preston does not take issue with the need to zealously guard the lobbyist-public official relationship. She argues simply that a small contribution is not so offensive as a larger one and that the small contribution should be permitted because it allows her to show symbolic support for a candidate. But this argument is no more than a judgment call with which the North Carolina legislature disagrees. In reviewing the State's legislation, we surely must defer on this issue so long as Preston and other lobbyists have other means of showing their symbolic support for a candidate. Indeed, Preston's argument depends on her claim that the Campaign Contributions Prohibition "does not leave open alternative means for lobbyists to participate in First Amendment activities." But her assertion simply overlooks numerous exceptions provided by the Campaign Contributions Prohibition.

Under the Campaign Contributions Prohibition, lobbyists can still volunteer with campaigns, including displaying signs or literature and erecting a yard sign in favor of a particular candidate. A lobbyist may contribute to PACs and even suggest to a PAC the candidate to whom the PAC should donate. A lobbyist may still engage in door-to-door canvassing and contribute other time to get the vote out. A lobbyist may attend a fund raiser on behalf of a candidate, so long as the lobbyist does not make a contribution to the candidate. Indeed, the lobbyist may host a fund raiser at the lobbyist's own home, so long as the costs are paid for by others or reimbursed. A lobbyist may, on behalf of a candidate, make speeches, telephone calls, and arrange meetings between the candidate and third parties for purposes of fundraising. These exceptions further narrow the scope of the statute.

Moreover, we should note that North Carolina's statute authorizes the Board to issue binding advisory opinions on the activities that are permissible under the law, and lobbyists who desire to engage in a marginal activity under the Campaign Contributions Prohibition can seek clarity by requesting an advisory opinion, compliance with which will absolve the lobbyist of any potential civil or criminal liability. N.C. Gen. Stat. § 163-278.23.

Preston has suggested that the Campaign Contributions Prohibition is unconstitutionally broad because it lacks key elements of other contribution bans that have been upheld by the courts. For example, she points to the fact that the Campaign Contributions Prohibition is not temporally limited, in contrast to North Carolina's previous contribution restriction, upheld by this court in *NCRL I*, which prohibited contributions by lobbyists *only when the legislature was in session*. *NCRL I*, 168 F.3d at 716. A temporal limitation, however, was not found to be essential to constitutionality, and mandating a temporal limitation would force legislatures to allow lobbyists to simply give a "wink or nod" while the legislature is in session and to donate as soon as it recesses. *See McConnell*, 540 U.S. at 137 (noting that closely drawn scrutiny "provides Congress with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process"). Preston also points out that the Campaign Contributions Prohibition does not depend on the identity of the recipient of a campaign contribution, in contrast to a similar California ban upheld by a California court, where the statute only prohibited contributions "by lobbyists, if the lobbyist is *registered* to lobby the office for which the candidate seeks election." *Inst. of Governmental Advocates v. Fair Political Practices Comm'n*, 164 F. Supp. 2d 1183, 1190 (E.D. Cal. 2001). But unlike California law, North Carolina law does not require lobbyists to specify the politicians whom they will be lobbying. Thus, Preston's argument can only be suggesting that we impose a requirement on the Campaign Contributions Prohibition that

would be virtually impossible to fulfill because of the nature of North Carolina's lobbyist-registration scheme.

At bottom, North Carolina's Campaign Contributions Prohibition is designed to prohibit only contributions having monetary value and then only when made by a lobbyist to a candidate. The lobbyist is left free to pursue any other First Amendment activity to express actual or symbolic support of a candidate, so long as that activity does not involve making a contribution having monetary value to the candidate or the candidate's campaign. We conclude that this Prohibition is appropriately tailored to address North Carolina's recent problems with corruption and to reassure its citizens that its politicians are acting on their behalf and not on behalf of the highest bidder. Rather than presenting a "risk[ ] to the democratic electoral process," *see Randall*, 548 U.S. at 248, prohibiting a financial relationship between lobbyists and candidates protects that process from actual corruption or the appearance of corruption—precisely the interests North Carolina has sought to protect.

Although difficult questions might arise at the margins of the Campaign Contributions Prohibition's scope, we conclude that the statute does not prohibit a substantial amount of protected conduct in relation to its plainly legitimate sweep and therefore is closely drawn to North Carolina's expressed interest of preventing corruption and the appearance of corruption from lobbyists' contributions.

Accordingly, the judgment of the district court is

*AFFIRMED*.