# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued En Banc September 30, 2014     Decided July 7, 2015

No. 13-5162

WENDY E. WAGNER, ET AL.,
PLAINTIFFS

v.

FEDERAL ELECTION COMMISSION,
DEFENDANT

———

On Certification of Constitutional Questions
from the United States District Court
for the District of Columbia
(No. 1:11-cv-01841)

———

*Alan B. Morrison* argued the cause for plaintiffs. With him on the briefs was *Arthur B. Spitzer*.

*Ilya Shapiro* and *Allen J. Dickerson* were on the brief for *amici curiae* Center for Competitive Politics, et al. in support of plaintiffs.

*Kevin Deeley*, Acting Associate General Counsel, Federal Election Commission, argued the cause for defendant. With him on the briefs were *Harry J. Summers*, Assistant General Counsel, and *Holly J. Baker* and *Seth E. Nesin*, Attorneys.

*J. Gerald Hebert*, *Scott L. Nelson*, *Fred Wertheimer*, and *Donald J. Simon* were on the brief for *amici curiae* Campaign Legal Center, et al. in support of defendant.

Before: GARLAND, *Chief Judge*, and HENDERSON, ROGERS, TATEL, BROWN, GRIFFITH, KAVANAUGH, SRINIVASAN, MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*:  Seventy-five years ago, Congress barred individuals and firms from making federal campaign contributions while they negotiate or perform federal contracts. The plaintiffs, who are individual government contractors, contend that this statute violates their First Amendment and equal protection rights.  Because the concerns that spurred the original bar remain as important today as when the statute was enacted, and because the statute is closely drawn to avoid unnecessary abridgment of associational freedoms, we reject the plaintiffs' challenge.

I

The statute at issue, 52 U.S.C. § 30119(a)(1), makes it unlawful for any person "who enters into any contract with the United States . . . directly or indirectly to make any contribution . . . to any political party, committee, or candidate for public office or to any person for any political purpose."  This prohibition applies "between the commencement of negotiations . . . and . . . the completion of performance" of the contract.  *Id.* The Federal Election Commission (FEC) has construed the section not to apply "in connection with State or local elections."  11 C.F.R. § 115.2(a).

The plaintiffs are three individuals who hold or have held federal contracts. The first two, Lawrence Brown and Jan Miller, spent much of their careers as full-time employees of the U.S. Agency for International Development (USAID). Each went back to work at USAID under a personal services contract after retirement. The third plaintiff, Wendy Wagner, is a law professor. In 2011, the Administrative Conference of the United States (ACUS) hired Wagner under a consulting contract to prepare a report about science and regulation.

All three plaintiffs wanted to make campaign contributions during the 2012 federal elections, but each was barred from doing so by § 30119. On October 19, 2011, they filed suit against the FEC in the United States District Court for the District of Columbia, challenging the statute's constitutionality. The plaintiffs contend that § 30119 violates their rights under both the First Amendment and the equal protection component of the Fifth Amendment's Due Process Clause.

The plaintiffs have been careful to frame their challenge narrowly. First, they challenge the constitutionality of § 30119 "only as it applies to plaintiffs and other individual contractors," not as it applies to contractors that are corporations or other kinds of entities. Pls. Br. 1. Second, they do not challenge the statute as the FEC might seek to apply it to a contractor's independent expenditures on electoral advocacy, as opposed to his or her contributions to candidates, parties, or political action committees (PACs). *Id.* at 40 n.5 (stating that the "[p]laintiffs have no interest in making independent expenditures"); Oral Arg. Recording 26:59-27:06 (same). Nor do they challenge the law as the Commission might seek to apply it to donations to PACs that themselves make only independent expenditures, commonly known as "Super PACs." Oral Arg. Recording 25:59-26:33 ("Super PACs . . . . are not at issue here; none of my clients wants to make a contribution to them or anything like

them."); *id.* 26:59-27:06 (same). In short, the plaintiffs challenge § 30119 only insofar as it bans campaign contributions *by* individual contractors *to* candidates, parties, or traditional PACs that make contributions to candidates and parties.

After considering the merits of this challenge, the district court granted summary judgment in favor of the FEC. *Wagner v. FEC*, 901 F. Supp. 2d 101, 113 (D.D.C. 2012). On appeal, a panel of this court held, sua sponte, that the district court lacked jurisdiction to reach the merits of the constitutional claims because the special judicial review provision of the Federal Election Campaign Act (FECA) "grants exclusive merits jurisdiction to the *en banc* court of appeals." *Wagner v. FEC*, 717 F.3d 1007, 1011 (D.C. Cir. 2013) (citing 2 U.S.C. § 437h, now codified at 52 U.S.C. § 30110). The panel therefore remanded the case to the district court to make appropriate findings of fact, and then to certify those facts and the relevant constitutional questions to this court sitting en banc. *Id.* at 1017.

The case has now returned to us. But time does not stand still, and some important facts have shifted in the years since this litigation began. The plaintiffs advise us that both Wagner and Brown have now completed their federal contracts and hence are once again free to make campaign contributions. *See* Brown Supp. Mootness Decl. ¶ 3; Second Wagner Supp. Decl. ¶ 2. Brown, at least, has already done so. *See* Brown Supp. Mootness Decl. ¶ 3. Accordingly, Wagner's and Brown's claims are moot. *See, e.g.*, *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67-72 (1997) (holding that the plaintiff's departure from her position as a state employee mooted her First

5

Amendment challenge to a law regulating the speech of state employees).[1]

Miller's contract is ongoing, however, and his constitutional claims therefore remain alive. But the mootness of the other plaintiffs' claims matters because Miller's injury is notably narrower than theirs. Whereas Wagner and Brown alleged that they wanted to support a variety of political "causes," and that they had given to "PACs" or "political committees" in the past, Miller tells us only that he wants to contribute to "candidates running for federal offices and/or their political parties." *Compare* Wagner Decl. ¶ 6, *and* Brown Decl. ¶¶ 6, 8, *with* Miller Decl. ¶ 7. Miller thus has standing to challenge the statute only as it applies to contributions to candidates and parties. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[S]tanding is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press . . . ." (citation and internal quotation marks omitted)).

---

[1]Although Wagner's ACUS contract is her first, she says that she "expect[s]" to "be offered other similar opportunities in the future" because her area of expertise "is a very important topic for federal regulatory agencies." Wagner Decl. ¶ 4. Brown also plans to seek future work with the federal government, "either as an employee or as a contractor," and therefore "may or may not be subject to" § 30119 at some future point. Brown Supp. Mootness Decl. ¶ 4. These possibilities are too speculative to sustain a concrete interest in this litigation. *See Munsell v. Dep't of Agric.*, 509 F.3d 572, 582-83 (D.C. Cir. 2007) (holding "that a live controversy is not maintained by speculation that claimant *might* reenter a business that it has left" (citing *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283-84 (2001))). Neither Brown nor Wagner has argued that his or her injury, though capable of repetition, will evade review unless we make an exception to the ordinary rule of mootness. *Cf. Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (explaining the situations in which that exception applies).

Our limited jurisdiction therefore narrows the plaintiffs' already-narrow challenge even further: the only issue properly before us is the application of § 30119 to contributions by an individual contractor to a federal candidate or political party. In Parts II through V, we address the plaintiffs' First Amendment arguments. In Part VI, we consider their equal protection arguments.[2]

## II

Since *Buckley v. Valeo*, the Supreme Court has instructed us to review different kinds of campaign finance regulations with different degrees of scrutiny. 424 U.S. 1, 19-25, 44-45 (1976); *see McCutcheon v. FEC*, 134 S. Ct. 1434, 1444 (2014) (plurality opinion); *McConnell v. FEC*, 540 U.S. 93, 134-38 (2003), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). Laws that limit a person's independent expenditures on electoral advocacy are subject to strict scrutiny. *McCutcheon*, 134 S. Ct. at 1444 (citing *Buckley*, 424 U.S. at 44-45). Under that standard, "the Government may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest." *Id.*; *see, e.g.*, *Citizens United*, 558 U.S. at 339-41.

Laws that regulate campaign contributions, however, are subject to "a lesser but still 'rigorous standard of review,'" *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 29), because "contributions lie closer to the edges than to the core of political expression," *FEC v. Beaumont*, 539 U.S. 146,

---

[2]We continue to describe the arguments as those of the "plaintiffs," notwithstanding that only a single plaintiff's arguments remain alive, because the plaintiffs presented their arguments collectively in a single set of briefs and oral arguments.

161 (2003). "Under that standard, '[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means *closely drawn* to avoid unnecessary abridgment of associational freedoms.'" *McCutcheon*, 134 S. Ct. at 1444 (emphasis added) (quoting *Buckley*, 424 U.S. at 25); *see Beaumont*, 539 U.S. at 161-62; *SpeechNow.org v. FEC*, 599 F.3d 686, 692 (D.C. Cir. 2010) (en banc).

The Supreme Court has repeatedly applied this "closely drawn" standard to challenges to campaign contribution restrictions.[3]   And it has repeatedly (and recently) declined invitations "to revisit *Buckley*'s distinction between contributions and expenditures and the corollary distinction in the applicable standards of review," *McCutcheon*, 134 S. Ct. at 1445.[4]  So, too, have we. *See, e.g.*, *SpeechNow.org*, 599 F.3d at 696.

---

[3]*See*, *e.g.*, *McCutcheon*, 134 S. Ct. at 1446-62 (aggregate contribution limits); *Randall v. Sorrell*, 548 U.S. 230, 246-63 (2006) (plurality opinion) (state contribution limits); *McConnell*, 540 U.S. at 231-32 (2003) (ban on contributions by minors); *Beaumont*, 539 U.S. at 161-63 (2003) (ban on corporate contributions); *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456-65 (2001) (limits on party expenditures that are coordinated with candidates); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386-95 (2000) (state contribution limits); *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 196-99 (1981) (plurality opinion) (limits on contributions to multicandidate committees).

[4]*See, e.g.*, *Shrink Mo. Gov't PAC*, 528 U.S. at 406-10 (Kennedy, J., dissenting); *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 635-640 (1996) (Thomas, J., concurring in the judgment and dissenting in part); *see also SpeechNow.org*, 599 F.3d at 696 (noting that the "*Citizens United* Court avoided 'reconsider[ing] whether contribution limits should be subjected to rigorous First Amendment scrutiny'" (quoting *Citizens United*, 558 U.S. at 359)).

The plaintiffs argue that we should nonetheless apply strict scrutiny here because § 30119 does not merely limit contributions, but bans them entirely. As the plaintiffs recognize, however, the Supreme Court expressly rejected this argument in *FEC v. Beaumont*, concluding that both limits and bans on contributions are subject to the same "closely drawn" standard. 539 U.S. at 161-63. "This argument," the Court said, "overlooks the basic premise we have followed in setting First Amendment standards for reviewing political financial restrictions: the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association." *Id.* at 161 (quoting *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 259 (1986)). "It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." *Id.* at 162. Indeed, although the plaintiffs insist that "[t]he closest case" to this one is *McConnell v. FEC*, which struck down a ban on contributions by persons under the age of eighteen, Pls. Br. 39, *McConnell* itself applied the "closely drawn" test, citing *Beaumont*. *See McConnell*, 540 U.S. at 231-32.

The plaintiffs further maintain that *Citizens United v. FEC* "casts doubt" on *Beaumont*. Pls. Br. 40. We do not see the basis for that claim. The plaintiffs correctly note that *Citizens United* "applied strict scrutiny to the ban on for-profit corporate independent expenditures." *Id.* But the reason for applying strict scrutiny was not that the case involved a ban, but that it involved independent expenditures rather than contributions. *See* 558 U.S. at 359. Accordingly, the "closely drawn" standard remains the appropriate one for review of a ban on campaign contributions. *See Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 156 (D.D.C.), *summ. aff'd*, 561 U.S. 1040 (2010); *Yamada v. Snipes*, No. 12-17845, 2015 WL 2384944, at \*19 & n.17 (9th Cir. May 20, 2015); *Preston v. Leake*, 660 F.3d 726,

734-35 (4th Cir. 2011); *Green Party of Conn. v. Garfield*, 616 F.3d 189, 199 (2d Cir. 2010).

There is one respect, however, in which the "closely drawn" standard may not be a perfect fit for this case. But that consideration would cut in favor of a more, rather than less, deferential standard of review. Section 30119 is a restriction on First Amendment activity aimed only at those who choose to work for the federal government. To be sure, citizens do not check their First Amendment rights at the agency door.[5] Nonetheless, the Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996) (internal quotation marks omitted); *see, e.g.*, *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 566-67 (1973); *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 99 (1947). In so doing, the Court has held that the government may "maintain a statutory restriction on employee speech" if it is "able to satisfy a balancing test of the *Pickering* form." *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 467 (1995) (referring to *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).[6]

---

[5]*See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (noting that the Court's "precedents have long since rejected Justice Holmes' famous dictum, that a policeman 'may have a constitutional right to talk politics, but he has no constitutional right to be a policeman'" (quoting *McAuliffe v. Mayor of New Bedford*, 29 N.E. 517, 517 (Mass. 1892))).

[6]Under the *Pickering* test, a court must "'arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it

Although the plaintiffs are contractors rather than employees, they acknowledge that their positions are often indistinguishable from those of employees. Pls. Br. 17, 19; *see* Miller Decl. ¶¶ 6-7 (stating that "the nature of the work performed by an individual rarely varied depending on whether the person was an employee or a contractor," and that "in almost every respect" his relationship to his agency and supervisor is "identical" to that of an employee); *see also* District Court Findings of Fact ¶ 13 [hereinafter D. Ct. Findings]. In fact, two of the plaintiffs "are retired employees from the same agency where they [were hired as] contractual consultants [to] do much the same work they previously did." Pls. Br. 35-36. The plaintiffs further acknowledge, in light of the case law described above, that Congress has greater latitude to restrict the expression of both employees and government contractors than it does with respect to the general public. *See* Oral Arg. Recording 6:00-08, 14:21-33. Indeed, the Court has expressly extended the *Pickering* balancing test to cases involving government contractors. *See Umbehr*, 518 U.S. at 684-85 (holding that there is no "difference of constitutional magnitude between independent contractors and employees" in the context of a speech-retaliation claim, and "that the same form of [*Pickering*] balancing analysis should apply to each" (internal quotation marks and citation omitted)); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 719-20 (1996).

To resolve this case, we need not precisely parse the way in which the "closely drawn" standard intersects with or differs from the *Pickering* balancing test. It will suffice for us to proceed under the rubric of the former, since it is -- if anything -- the less deferential standard. In doing so, however, we will take into account the considerations that the Supreme Court has

---

performs through its employees.'" *NTEU*, 513 U.S. at 465-66 (quoting *Pickering*, 391 U.S. at 568).

indicated are particularly relevant in evaluating restrictions the government imposes in its role as employer. We therefore now proceed to examine whether, with respect to § 30119, the government has "'demonstrate[d] a sufficiently important interest and employ[ed] means closely drawn to avoid unnecessary abridgment of associational freedoms.'" *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 25).

III

Our initial responsibility under the "closely drawn" standard is to determine whether the government has advanced a "sufficiently important interest" in support of § 30119. The FEC argues that there are two such interests, each of which has been accepted by the Supreme Court as sufficient to warrant appropriate restrictions on First Amendment rights. We briefly address the sufficiency of each of those interests in the abstract, before turning to whether they are properly invoked in light of the particular problems that § 30119 addresses.

A

The two interests asserted by the government are: (1) protection against quid pro quo corruption and its appearance, and (2) protection against interference with merit-based public administration.

The first interest is the most significant, as the Supreme Court has repeatedly held that "the Government's interest in preventing *quid pro quo* corruption or its appearance [is] 'sufficiently important'" to justify the regulation of campaign contributions. *McCutcheon*, 134 S. Ct. at 1445 (quoting *Buckley*, 424 U.S. at 26-27). In fact, the Court has "stated that the same interest may properly be labeled 'compelling,' so that

the interest would satisfy even strict scrutiny." *Id.* at 1445 (citing *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985)). As the Court has explained, "[t]hat Latin phrase captures the notion of a direct exchange of an official act for money," *id.* at 1441, and such exchanges undermine "the integrity of our system of representative democracy," *Buckley*, 424 U.S. at 26-27. "Of almost equal concern [is] . . . the appearance of corruption," which threatens "'confidence in the system of representative Government.'" *Id.* at 27 (quoting *Letter Carriers*, 413 U.S. at 565). Therefore, if the FEC shows that § 30119 furthers the interest in combating quid pro quo corruption or its appearance, that will suffice to clear the "closely drawn" standard's first hurdle.[7]

The second interest is also significant, and in combination with the first makes this case even stronger for the FEC. Although the Supreme Court has identified no congressional objective beyond protection against quid pro quo corruption and its appearance that warrants imposing campaign finance restrictions on the citizenry at large, *see McCutcheon*, 134 S. Ct. at 1450; *Citizens United*, 558 U.S. at 359, it has "upheld a narrow class of speech restrictions that operate to the disadvantage of certain persons, . . . . based on an interest in allowing governmental entities to perform their functions," *Citizens United*, 558 U.S. at 341 (citing, inter alia, *Letter Carriers*, 413 U.S. at 557). That narrow class of approved speech restrictions includes the Hatch Act's limits on political activities by federal employees, which, as the Court put it in *Citizens United*, rest on the principle that "'[f]ederal service should depend upon meritorious performance rather than political service.'" 558 U.S. at 341 (quoting *Letter Carriers*, 413 U.S. at 557).

_____

[7]Throughout this opinion, when we use the terms "corruption" or its "appearance," we refer to the quid pro quo variety.

The Court's cases indicate that this interest in protecting merit-based public administration has two distinct but mutually reinforcing components. The first is that the Government "operate effectively and fairly," *Letter Carriers*, 413 U.S. at 564, which in turn comprises a series of interrelated concerns. The "'interest of the [government], as an employer, in promoting the *efficiency* of the public services it performs through its employees,'" *id.* (emphasis added) (quoting *Pickering*, 391 U.S. at 568), is perhaps best captured by the Court's rationale for upholding the original 1876 employee contribution ban: "If . . . a refusal [to make political contributions] may lead to putting good men out of the service, liberal payments may be made the ground for keeping poor ones in." *Ex parte Curtis*, 106 U.S. 371, 375 (1882). The related interest in operating *fairly* is the "great end of Government -- the impartial execution of the laws." *Letter Carriers*, 413 U.S. at 565. "It seems fundamental," the Court has said, that "those working for [Government] agencies, should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party." *Id.* at 564-65. In this regard, "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Id*. at 565.

The flip side of the interest in governmental efficiency and fairness is the employees' interest in being "sufficiently free from improper influence" or coercion, which the government may also vindicate on their behalf. *Id.* As the Court has explained, it upheld the Hatch Act's restrictions on "political campaigning" by federal employees in part because, in the Court's "judgment[,] . . . congressional subordination of those activities was permissible to safeguard the core interests of

individual belief and association." *Elrod v. Burns*, 427 U.S. 347, 371 (1976). *See NTEU*, 513 U.S. at 471 (explaining that "the Hatch Act aimed to *protect* employees' rights, notably their right to free expression, rather than to restrict those rights"); *Letter Carriers*, 413 U.S. at 566 (identifying an interest, "as important as any other," in "mak[ing] sure that Government employees would be free from pressure and from express or tacit invitation to . . . perform political chores in order to curry favor with their superiors"); *Ex parte Curtis*, 106 U.S. at 374 (identifying "the protection of those in the public service against unjust exactions" as an independently sufficient basis for upholding the 1876 statute restricting contributions by federal employees).

The Supreme Court has repeatedly credited these "obviously important interests sought to be served by . . . limitations on partisan political activities," *Letter Carriers*, 413 U.S. at 564, for over a century.[8] And there is no reason why they should not be heard in support of restrictions on contractors as well as regular employees. *Cf. NASA v. Nelson*, 562 U.S. 134, 150 (2011) (rejecting the respondents' argument that, "because they are contract employees and not civil servants, the Government's broad authority in managing its affairs should apply with diminished force"); *Umbehr*, 518 U.S. at 676-79 (noting that, under the *Pickering* balancing test, "'[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated . . . to a significant one when it acts as employer,'" and holding that *Pickering* applies to claims by independent contractors that they were terminated for

---

[8] *See, e.g.*, *Citizens United*, 558 U.S. at 341; *NTEU*, 513 U.S. at 471; *Elrod*, 427 U.S. at 370; *Buckley*, 424 U.S. at 27; *Letter Carriers*, 413 U.S. at 557; *Mitchell*, 330 U.S. at 98; *Ex parte Curtis*, 106 U.S. at 374-75.

their speech (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion))).

We now proceed to examine whether these two Court-approved justifications for limitations on campaign activities -- to protect against quid pro quo corruption and its appearance, and to protect merit-based administration -- are furthered by the contractor contribution statute.

B

We begin with the historical pedigree of § 30119, which stretches back to the 1870s. That history demonstrates that Congress did indeed aim to protect the two interests articulated by the FEC, and that its concerns on both fronts were well warranted.

1. Congress began to tackle problems related to the political activity of those who work for the government in the late 19th century. *See generally Letter Carriers*, 413 U.S. at 555-60. It started by prohibiting most federal employees "from requesting, giving to, or receiving from, any other . . . employee of the Government, any money or property . . . for political purposes." Act of Aug. 15, 1876, ch. 287, § 6, 19 Stat. 143, 169. In upholding that early statute as "within the just scope of legislative power," the Supreme Court declared that its "evident purpose" was "to promote efficiency and integrity in the discharge of official duties" and "to protect the classes of . . . employees provided for from being compelled to make contributions for [political] purposes through fear of dismissal if they refused." *Ex parte Curtis*, 106 U.S. at 373-74.

The 1876 statute was limited to employees of the Executive Branch. In the 1883 Pendleton Act, Congress took the next step, making it a crime for its own members, among others, to "solicit

or receive" political contributions from federal workers, ch. 27, § 11, 22 Stat. 403, 406, and for those workers to "give or hand over" such contributions, *id.* § 14, 22 Stat. at 407.[9] The Pendleton Act further declared that "no person in the public service is for that reason under any obligations to contribute to any political fund." *Id.* § 2, 22 Stat. at 404. And it "authorized the President to promulgate rules to carry the Act into effect and created the Civil Service Commission as the agency or administrator of the Act." *Letter Carriers*, 413 U.S. at 558.

In 1925, Congress broadened the ban to include solicitation and receipt by congressional challengers as well as incumbents, while continuing to tweak the range of forbidden donors. *See* Federal Corrupt Practices Act, 1925, ch. 368, sec. 312, § 118, 43 Stat. 1070, 1073. When Congressman Harry Wurzbach was subsequently indicted for receiving contributions from federal employees, the Supreme Court again upheld the statute as a proper exercise of Congress' powers. *United States v. Wurzbach*, 280 U.S. 396 (1930); *see Mitchell*, 330 U.S. at 98.

Alongside these early bans on campaign contributions, Congress and the Executive Branch incrementally expanded the scope of the nascent civil service system, imposing limitations on political activity by employees and implementing merit-based hiring rules. *See Letter Carriers*, 413 U.S. at 557-60.

---

[9] Because the Pendleton Act prohibited accepting contributions from "any person receiving any salary or compensation from moneys derived from the Treasury of the United States," *id.* § 11, 22 Stat. at 406, it textually encompassed contributions from the various government contractors of the era -- ranging from experts hired to survey Indian lands, *see* Contract for Surveying Public Lands, 10 Op. Att'y Gen. 261, 261 (1862), to a contractor hired to make copies of patent drawings for the Commissioner of Patents, *see* Letting Contracts--Advertisement, 15 Op. Att'y Gen. 538 (1876).

Those efforts culminated in the Hatch Act of 1939, which aimed to consolidate civil service reforms and "to combat demonstrated ill effects of Government employees' partisan political activities." *NTEU*, 513 U.S. at 471. As the Court has explained, Congress' purpose was to protect merit-based administration, including ensuring governmental efficiency and fairness and shielding government personnel from political coercion. *See Letter Carriers*, 413 U.S. at 564-66.

The Hatch Act was particularly aimed at certain notorious abuses that occurred during the 1936 and 1938 election campaigns. *See id.* at 559-60. Responding to reports that workers paid by the Works Progress Administration (WPA) had been coerced to contribute to the Democratic Party, for example,[10] the Hatch Act criminalized accepting political contributions from anyone known to be receiving "compensation, employment, or other benefit" from work relief funds. Hatch Act, ch. 410, §§ 5, 8, 53 Stat. 1147, 1148.

The Act imposed other restrictions on political activity by government employees as well, including barring them from "tak[ing] any active part in political management or in political campaigns." *Id.* § 9(a), 53 Stat. at 1148. In subsequently upholding those restrictions against a First Amendment challenge, the Supreme Court noted that they were "not dissimilar in purpose from the statutes against political

---

[10]*See, e.g.*, 84 CONG. REC. 9598 (1939) (statement of Rep. Taylor) (reporting that WPA workers had been required to place $3 to $5 out of their $30 monthly pay under a Democratic donkey paperweight on their supervisor's desk); *see also* REPORT OF THE SPECIAL COMM. TO INVESTIGATE SENATORIAL CAMPAIGN EXPENDITURES AND USE OF GOVERNMENTAL FUNDS IN 1938, S. REP. NO. 76-1, pt. 1, at 8-33, 39 (1939) (recounting WPA abuses and recommending reforms).

contributions of money." *Mitchell*, 330 U.S. at 98. Congress, the Court said, "recognizes danger to the [civil] service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections." *Id.* Twenty-six years later, the Court again rejected a First Amendment challenge to the same restrictions. *See Letter Carriers*, 413 U.S. at 551.

Although the 1939 Hatch Act focused on public employees and recipients of work relief, exploitation of government contractors drew congressional interest as well. Arguing that the original bill "does not go far enough," Congressman J. Will Taylor pointed to the coercion of contractors in the "'celebrated' Democratic campaign book" scandal as a prime example of "political immorality and skullduggery that should not be tolerated." 84 CONG. REC. 9598-99 (1939). Representative Taylor recounted that, at the behest of the Democratic National Committee, party representatives paid visits to government contractors, reminding each one "of the business he had received from the Government" and explaining that the contractor was expected to buy a number of the party's souvenir convention books -- at $250 each -- "in proportion to the amount of Government business he had enjoyed." *Id.* In addition, "large concerns, which directly or indirectly, benefitted from Government business, were . . . by sinister methods, convinced of the importance of taking advertising space in the book." *Id.*; *see also* 81 CONG. REC. 6429-30 (1937) (statement of Rep. Taylor) (citing newspaper report regarding solicitation of contractors in Tennessee). Taylor urged that the bill "should be amended to include rackets of this character." 84 CONG. REC. 9599 (1939).

The next year, as the scandal surrounding the campaign books persisted,[11] Congress took up that task in a package of amendments to the Hatch Act. Denouncing contracting abuses as "[t]he greatest source of corruption in American politics today," Senator Harry Byrd argued for a broad amendment that would "prevent those who are making money out of governmental contracts from making contributions to any political party," and thereby "prevent them from making contributions which may be considered in some instances as bribery in order to secure governmental contracts for themselves." 86 CONG. REC. 2982 (1940). Thus, in addition to specifically banning the purchase of goods (such as the campaign books) from political parties, *see* Act of July 19, 1940, ch. 640, sec. 4, § 13(c), 54 Stat. 767, 770-71, Congress enacted the general contractor contribution ban that is now before us, *id.* § 5(a), 54 Stat. at 772.

The statute that Congress passed in 1940 has retained its essential features since that time. Then, as now, it barred any person or firm negotiating or performing a federal contract from contributing "to any political party, committee, or candidate for public office or to any person for any political purpose or use." *Id.* (codified as amended at 52 U.S.C. § 30119(a)(1)).

2. Just as the Hatch Act was spurred by outrage over misconduct in the 1936 and 1938 elections, "deeply disturbing examples" of corruption "surfacing after the 1972 election" led to the Federal Election Campaign Act (FECA) Amendments of

---

[11]*See, e.g.*, 86 CONG. REC. 9362 (1940) (statement of Rep. Knutson) (recounting advertising rates for the 1940 Democratic campaign book and speculating that "all of this space will be taken by Government contractors," who would be "solicit[ed] . . . at the point of a gun"); *see also* Editorial, *That Convention Book*, N.Y. TIMES, Mar. 13, 1940, at 22.

1974. *Buckley*, 424 U.S. at 27 & n.28 (citing *Buckley v. Valeo*, 519 F.2d 821, 839-840 & nn. 36-38 (D.C. Cir. 1975) (en banc)). Particularly important for our purposes, those "disturbing examples" included a variety of efforts to channel government contracts to President Nixon's political supporters and to exact contributions from existing contractors, both of which figured prominently in the Senate Watergate Committee's report. *See, e.g.*, FINAL REPORT OF THE SELECT COMM. ON PRESIDENTIAL CAMPAIGN ACTIVITIES, S. REP. NO. 93-981, at 368 (1974) [hereinafter WATERGATE REPORT] (describing the so-called "Responsiveness Program," pursuant to which agencies were to ensure that "[t]he letting of Government grants, contracts, and loans" was directed at "meet[ing] reelection needs"); *id.* at 412 (recounting evidence that "campaign officials were participating in the selection process for the awards of GSA architectural and engineering design contracts"); *id.* at 1210 & n.85 (separate views of Sen. Weicker) (recounting "evidence of *quid pro quos* for the contracts from" four cabinet departments and six agencies).[12]

As the Watergate Committee recognized, much of the conduct that it exposed squarely implicated the contractor contribution statute (then 18 U.S.C. § 611). *See* WATERGATE REPORT at 440. The Committee reported that the 1972 election

---

[12]*See also* WATERGATE REPORT at 440 ("There is evidence that plans were laid for Government officials and others to solicit campaign contributions from minority recipients of Federal grants, loans, and contracts. Moreover, the committee has obtained evidence that these plans were in part consummated."); *id.* at 384-85 (recounting testimony that a contract was awarded to a Nixon fundraiser "based solely on political motivations" and "'rammed down the throats' of Department officials"). In the passage of our *Buckley* opinion later relied upon by the Supreme Court, this court leaned heavily on the Watergate Report. *See* 519 F.2d at 839 nn.35-36, 38.

gave rise to the first indictments of contributors under that statute, resulting in guilty pleas and then-maximum fines. *Id.* at 486-89. "In view of the abuses discovered," it recommended that Congress take care not to "lessen the penalties" or otherwise "weaken[] . . . the law in this area." *Id.* at 444. The Committee further concluded that the statutory scheme was "deficient in failing to provide a civil penalty," which made it difficult to address "nonflagrant cases," and recommended that the new Federal Election Commission be given primary civil enforcement jurisdiction with respect to, inter alia, the contractor contribution statute. *Id.* at 566-67.

A few months after the Watergate Committee made its recommendations, Congress increased the maximum fine for violations of the contractor contribution statute from $5,000 to $25,000, *see* FECA Amendments of 1974, Pub. L. No. 93-443, § 101(e)(2), 88 Stat. 1263, 1267, and authorized the Commission to initiate civil enforcement actions for violations of that provision, *see id.* sec. 208(a), § 314(a)(7), 88 Stat. at 1285.[13] It also strengthened enforcement of the longstanding bans on campaign contributions by corporations and labor unions. *See id*. § 101(e)(1), 88 Stat. at 1267; *see also Beaumont*, 539 U.S. at 152-53 (recounting the history of those bans). And, as is well known, the 1974 amendments also imposed generally applicable ceilings on campaign contributions. *See McCutcheon*, 134 S. Ct. at 1445; *Buckley*, 424 U.S. at 7. FECA's "primary purpose," the Court has said, "was to limit *quid pro quo* corruption and its appearance." *McCutcheon*, 134 S. Ct. at 1444 (citing *Buckley*, 424 U.S. at 26-27).

---

[13]That monetary penalty has since been superseded by FECA's own penalty scheme. *See* 52 U.S.C. § 30109(a)(5)-(6) (civil penalties); *id.* § 30109(d) (criminal penalties).

Finally, in 1976, Congress incorporated the contractor contribution ban into FECA itself. *See* FECA Amendments of 1976, Pub. L. No. 94-283, sec. 112(2), § 322, 90 Stat. 475, 492-93. Over the subsequent decades, both FECA and the civil service laws have been further amended. Those amendments lifted most restrictions on campaign contributions by federal employees.[14] At the same time, however, they retained some of the more direct limits on government employees' political activities, including barring most federal employees from soliciting or accepting political contributions, running for office in partisan elections, and hosting political fundraisers. *See* 5 U.S.C. §§ 7323(a), 7324(a). The Civil Service Reform Act of 1978 also afforded federal employees protection against "prohibited personnel practices," 5 U.S.C. § 2302, including discrimination on the basis of political affiliation and coercion to make political contributions, *id.* § 2302(b)(1)(E), (b)(3), and allowed them to seek redress through the Office of Special Counsel and the Merit Systems Protection Board, 5 U.S.C. §§ 1214-15, 1221. Congress has left the contractor contribution ban in place, however, without change. *See* 52 U.S.C. § 30119.

3. As we have recounted, Congress enacted § 30119 in the aftermath of a national scandal involving a pay-to-play scheme for federal contracts. The statute was itself the outgrowth of a decades-long congressional effort to prevent corruption and ensure the merit-based administration of the national government. And it was followed by subsequent scandals that led to further legislative refinements, again motivated by concerns over corruption and merit protection.

---

[14]*See, e.g.*, Hatch Act Reform Amendments of 1993, Pub. L. No. 103-94, sec. 2(a), § 7323, 107 Stat. 1001, 1002 (1993) (codified at 5 U.S.C. § 7323); *id.* § 4(b), 107 Stat. at 1005 (codified at 18 U.S.C. § 603(c)).

This historical pedigree is significant. As the Court said in *Beaumont*, "[j]udicial deference is particularly warranted where, as here, we deal with a congressional judgment that has remained essentially unchanged throughout a century of 'careful legislative adjustment.'" 539 U.S. at 162 n.9 (quoting *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 209 (1982)). Moreover, as we discuss in Part V below, the lineage of the statute makes clear that its objects are the legitimate and important purposes that the Commission claims they are.

C

More recent evidence confirms that human nature has not changed since corrupt quid pro quos and other attacks on merit-based administration first spurred the development of the present legislative scheme. Of course, we would not expect to find -- and we cannot demand -- continuing evidence of large-scale quid pro quo corruption or coercion involving federal contractor contributions because such contributions have been banned since 1940. As the Supreme Court has recognized, "no data can be marshaled to capture perfectly the counterfactual world in which" an existing campaign finance restriction "do[es] not exist." *McCutcheon*, 134 S. Ct. at 1457.[15] Instead, "'the question is whether experience under the present law confirms a serious threat of abuse.'" *Id.* (quoting *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001)).

---

[15]*See Burson v. Freeman*, 504 U.S. 191, 208 (1992) (plurality opinion) ("The fact that these laws have been in effect for a long period of time also makes it difficult for the States to put on witnesses who can testify as to what would happen without them."); *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) (noting the "difficulty of mustering evidence to support long-enforced statutes" because "there is no recent experience" without them).

The experience of states with and without similar laws is also relevant. *See id.* at 1451 n.7; *Citizens United*, 558 U.S. at 357.

Unfortunately, as was the case with the coordinated expenditure limits at issue in *Colorado Republican*, "[d]espite years of enforcement of the challenged" contractor contribution ban, "substantial evidence demonstrates" that individuals and firms continue to "test the limits of the current law[s]," 533 U.S. at 457 -- at both the federal and state levels. This experience readily confirms that the government's fear of the consequences of removing the current ban is not unwarranted.

1. We begin with Congress itself, where a number of corruption scandals point to the danger that contributions from government contractors would pose. Indeed, although the plaintiffs contend that Members of Congress are insulated from the contracting process, *see infra* Part III.D.1, many significant congressional corruption cases involve quid pro quo agreements regarding contracts. In 2005, for example, Representative Randy "Duke" Cunningham pled guilty to accepting millions of dollars in bribes in exchange for influencing Defense Department contract awards. *See* Plea Agreement at 4-6, ECF No. 40 ex. 2, *United States v. Cunningham*, No. 3:05-cr-2137 (S.D. Cal. Nov. 28, 2005). Mitchell Wade, the defense contractor who pled guilty to bribing Cunningham, admitted to making illegal "straw" contributions to two other Members of Congress as well, both of whom he targeted for their perceived "ability to request appropriations funding that would benefit" his company. Statement of Offenses at 12, *United States v. Wade*, No. 1:06-cr-49 (D.D.C. Feb. 24, 2006).[16]

---

[16]Wade and the contracting corporation later agreed to pay a $1 million civil penalty for violating, inter alia, § 30119 (then 2 U.S.C. § 441c). Conciliation Agreement at 6-7, *In re MZM, Inc. and Mitchell Wade*, Matter Under Review 5666 (FEC, Oct. 30, 2007).

In 2006, Representative Bob Ney similarly pled guilty to a series of quid pro quos with the lobbyist Jack Abramoff, including steering a "multi-million dollar" contract for a House of Representatives infrastructure project to one of Abramoff's clients. *See* Factual Basis for Plea at 6, *United States v. Ney*, No. 1:06-cr-272 (D.D.C. Sept. 15, 2006). And in 1981, Senator Harrison Williams was convicted on bribery and corruption charges for crimes exposed in the FBI's Abscam investigation. Williams "agreed to use his position as a United States Senator to obtain government contracts" for titanium to be produced by a mine financed by fictional Arab businessmen. *United States v. Williams*, 529 F. Supp. 1085, 1091 (E.D.N.Y. 1981), *aff'd*, 705 F.2d 603 (2d Cir. 1983).

One might argue from this record that the general ban on contractor contributions is unnecessary prophylaxis: after all, congressmen who enter into quid pro quo agreements go to jail anyway. But as the Supreme Court has explained, "laws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts of those with money to influence governmental action." *Buckley*, 424 U.S. at 27-28. Although the criminal cases certainly confirm the appetite for corruption in contracting -- and the availability of channels for carrying it out -- corruption and its appearance are no doubt more widespread in the contracting process than our criminal dockets reflect.

The Executive Branch is also an obvious site of potential corruption in the contracting process, since its agencies are the ones that ultimately award contracts. This was a key focus of congressional concern during the Watergate hearings. *See supra* Part III.B.2; *see also, e.g.*, WATERGATE REPORT at 409 (describing a consultant who "was made to feel that his continued success in obtaining Government contracts would, in significant degree, be dependent on his contributing to the

President's reelection").[17]   Many more recent instances of corruption or its appearance in the agency contracting process are collected in the Defense Department's aptly named *Encyclopedia of Ethical Failure*.  *See generally* DEP'T OF DEFENSE, OFFICE OF GEN. COUNSEL, ENCYCLOPEDIA OF ETHICAL FAILURE 4-58, 77-78, 82, 84-88, 132-46 (updated 2014).

2. Further evidence comes from the states, many of which have enacted pay-to-play laws in response to their own recent experiences.  At least seventeen states now limit or prohibit campaign contributions from some or all state contractors or licensees.[18]  The fact that many states have such laws shows that

_____

[17]Another notorious pay-to-play contracting scheme of the Watergate era involved Vice President Spiro Agnew.  In 1973, a federal investigation uncovered evidence that Agnew had accepted bribes (including campaign contributions) in exchange for infrastructure contracts while serving as Baltimore County Executive and Governor of Maryland -- and that he had continued to request payments from contractors as Vice President, "stat[ing] expressly that he hoped to be able to be helpful . . . with respect to the awarding of Federal engineering contracts."  Exposition of the Evidence at 3-4, *United States v. Agnew*, No. 73-0535 (D. Md. Oct. 10, 1973), *reprinted in* FBI Records: Spiro Agnew, Part 16, at 130, http://vault.fbi.gov/Spiro%20Agnew.  The Attorney General agreed that Agnew could plead *nolo contendere* to a single count of tax evasion if he resigned his office, which he did.  *See* Transcript of Plea Hearing at 7-8, *United States v. Agnew*, No. 73-0535 (D. Md. Oct. 10, 1973), *available at* http://research.archives.gov/description/279170.

[18]The laws of Hawaii and West Virginia most closely track the text and design of § 30119.  *See* HAW. REV. STAT. § 11-355; W. VA. CODE § 3-8-12(d).  Other states have tailored their restrictions differently -- often more broadly than the federal model in some respects, such as by sweeping in the individual principals of contracting firms, and more narrowly in others, such as by targeting

the federal statute is no outlier. Moreover, the corruption scandals that prompted the adoption of those laws further demonstrate the dangers that § 30119 helps stave off at the federal level.[19]

New Jersey's law, for example, was enacted in the aftermath of a state investigation finding that a $392 million contract for a failed project went to a firm that had made extensive campaign contributions to state candidates and political committees. *See* STATE OF N.J. COMM'N OF INVESTIGATION, N.J. ENHANCED MOTOR VEHICLE INSPECTION CONTRACT 1-2, 62-65 (2002). Similarly, Illinois' law was passed after former Governor George Ryan was convicted of racketeering charges based on his efforts, as Secretary of State, to steer state contracts to friendly firms in exchange for financial support for his gubernatorial campaign. *United States v.*

---

particular industries or imposing ceilings on contract or contribution size. *See* CAL. GOV'T CODE § 84308(d); CONN. GEN. STAT. § 9-612(f)(1)-(2); 30 ILL. COMP. STAT. 500/50-37; IND. CODE §§ 4-30-3-19.5 to -19.7; KY. REV. STAT. ANN. § 121.330; LA. REV. STAT. ANN. §§ 18:1505.2(L), 27:261(D); MICH. COMP. LAWS § 432.207b; NEB. REV. STAT. §§ 9-803, 49-1476.01; N.J. STAT. ANN. § 19:44A-20.13 to -20.14; N.M. STAT. ANN. § 13-1-191.1(E)-(F); OHIO REV. CODE ANN. § 3517.13(I)-(Z), *invalidated in part on other grounds*, *United Auto Workers, Local Union 1112 v. Brunner*, 911 N.E.2d 327 (Ohio Ct. App. 2009); 53 PA. CON. STAT. § 895.704-A(a); S.C. CODE ANN. § 8-13-1342; VT. STAT. ANN. tit. 32, § 109(b); VA. CODE ANN. § 2.2-3104.01.

[19]Further evidence also comes from the Securities and Exchange Commission, which in 1994 approved a pay-to-play rule for municipal financing in response to concern that brokers and dealers were making political contributions to state and local officials to influence the choice of underwriters. This court upheld that rule against First Amendment challenge in *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995).

*Warner*, 498 F.3d 666, 675 (7th Cir. 2007); *see* Ray Long, *Illinois Senate Overrides Blagojevich's Veto, Enacts 'Pay-to-Play' Ethics Law*, CHI. TRIB., Sept. 23, 2008, at 1. The law's passage prompted Ryan's successor, Governor Rod Blagojevich, to redouble his efforts to solicit contributions from state contractors before the new rules took effect. *See* Mike McIntire & Jeff Zeleny, *Obama's Intervention for Ethics Bill Indirectly Led to Case Against Governor*, N.Y. TIMES, Dec. 10, 2008, at A32. Those efforts in turn drew the interest of federal prosecutors, and Blagojevich was ultimately convicted of various forms of pay-to-play corruption, including attempting to extort campaign contributions from the chief executive of a hospital in exchange for raising Medicaid reimbursement rates, as well as offenses in connection with his effort to sell a U.S. Senate seat. *See* Jury Verdict, *United States v. Blagojevich*, No. 1:08-cr-888 (N.D. Ill. June 27, 2011).

In 2005, Connecticut passed a Campaign Finance Reform Act that prohibited "campaign contributions by state contractors, lobbyists, and their families." *Green Party*, 616 F.3d at 192. In upholding the contractor contribution ban, the Second Circuit noted that it was passed "in response to several corruption scandals in Connecticut," which together had "helped earn the state the nickname 'Corrupticut.'" *Id.* at 193 (quoting *Green Party of Conn. v. Garfield*, 616 F.3d 213, 218-19 (2d Cir. 2010)) (internal quotation marks omitted). As the court detailed:

> The most widely publicized of the scandals involved Connecticut's former governor, John Rowland. In 2004, Rowland was accused of accepting over $100,000 worth of gifts and services from state contractors . . . . Rowland accepted the gifts, it was alleged, in exchange for assisting the contractors in securing lucrative state contracts. Rowland resigned amidst the allegations, and in 2005 pleaded guilty --

along with two aides and several contractors -- to federal charges in connection with the scandal.

*Id.* (quoting *Green Party*, 616 F.3d at 218-19). In light of that experience, the court found "sufficient evidence" of "actual corruption stemming from contractor contributions," as well as "a manifest need to curtail the appearance of corruption created by contractor contributions." *Id.* at 200.

Later, the Second Circuit also upheld New York City's law limiting contributions by entities "doing business with" the City. *Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2011). In so doing, the court noted that there were "actual pay-to-play scandals in New York City in the 1980s," *id.* at 188-89, and that there were "several recent scandals . . . specifically involv[ing] pay-to-play campaign donations" in New York State, *id.* at 190 n.15.[20]

We could go on. The FEC has assembled an impressive, if dismaying, account of pay-to-play contracting scandals, not only in the above states, but also in New Mexico, Hawaii, Ohio, California, and elsewhere. *See* FEC's Proposed Findings of

---

[20]The plaintiffs point out that, in *Lavin v. Husted*, the Sixth Circuit overturned an Ohio statute that made it a crime for candidates for attorney general or county prosecutor to accept contributions from Medicaid providers. 689 F.3d 543 (6th Cir. 2012). The court did so because, inter alia, the defendant Secretary of State "concede[d] that he ha[d] *no evidence at all* in support of his theory that [the statute] prevent[ed] actual or perceived corruption among prosecutors in Ohio." *Id.* at 547 (emphasis added). As we discuss in the text, that is emphatically not the situation here. *See also id.* (distinguishing *Green Party* on the ground that there the state did have evidence "to demonstrate how its ban on contributions from contractors would help bring such scandals to an end").

Fact, J.A. 298-313.[21]  But we think that the evidence canvassed

_____

[21]*See also, e.g.*, *Yamada*, 2015 WL 2384944, at \*20 (upholding Hawaii contractor contribution ban "in light of past 'pay to play' scandals and the widespread appearance of corruption that existed at the time" the ban was passed in 2005); *United States v. Dimora*, 750 F.3d 619, 623 (6th Cir. 2014) (affirming conviction of Ohio county official who "influenced Cleveland decision-makers and steered public contracts in return for approximately 100 bribes worth more than $250,000"); Plea Agreement at 3, *United States v. Montoya*, No. 1:05-cr-2050 (D.N.M. Nov. 8, 2005) (guilty plea of New Mexico State Treasurer, who explained that "it was quite easy to get bribes from people who wanted to keep or obtain business," including individual investment and financial advisors); James Drew & Steve Eder, *Petro: Noe Stole Millions*, TOLEDO BLADE, July 22, 2005 (reporting on an Ohio scandal in which state workers' compensation funds were invested with a major political contributor who was ultimately convicted of both corruption and theft from the funds, *see State v. Noe*, 2009 WL 5174163 (Ohio Ct. App. 2009)); Carl Ingram, *Former Davis Aide Faces Charges in Oracle Probe*, L.A. TIMES, Mar. 3, 2004 (recounting incident in which a corporate lobbyist delivered a $25,000 contribution to the Governor of California's reelection campaign, via his policy director, days after the state signed a $95 million contract with the company; the contribution was ultimately returned and the contract rescinded); Bruce Dunford, *Jail Time, Fines Are Levied in Hawaii Election Probe*, BOSTON GLOBE, Jan. 12, 2004, at A3 (detailing "a scandal in which respected architects and engineers illegally made political donations in the names of their employees, wives, and children, allegedly to win government contracts" in Honolulu); *United States v. Troutman*, 814 F.2d 1428, 1433-36 (10th Cir. 1987) (affirming the extortion conviction of New Mexico's State Investment Officer for demanding that a bank make political contributions in order to obtain a state contract); *cf.* Patrick Madden, *The Cost of D.C. Council's Power Over Contracts*, WAMU (Oct. 14, 2014), http://wamu.org/projects/paytoplay/#/story (reporting on an investigation that "identified more than $5 million in political contributions from more than 300 firms with [D.C.] Council-approved contracts from 2005 to 2014," and that revealed that "[r]oughly half

thus far suffices to show that, in government contracting, the risk of quid pro quo corruption and its appearance, and of interference with merit-based administration, has not dissipated. Taken together, the record offers every reason to believe that, if the dam barring contributions were broken, more money in exchange for contracts would flow through the same channels already on display.

D

Notwithstanding the above, the plaintiffs argue that the interests asserted by the Commission are not furthered by § 30119 for two reasons.

1. The plaintiffs contend that changes in government contracting practices since the 1940s -- especially the advent of formalized competitive bidding -- render the current system "immune from political interference" in the majority of cases. Pls. Br. 11. Thus, they maintain, "even if a pay-to-play rationale might have made [the statute] defensible in 1940, the vast changes in federal procurement since then have made it indefensible on that basis today." *Id.* at 13. We are unpersuaded.

First, the facts that we have recounted above speak for themselves. *See supra* Part III.C.1. If contracting were truly immune from political interference, for example, Rep. Cunningham could not have "pressure[d] and influence[d] United States Department of Defense personnel to award and execute government contracts." Plea Agreement at 6, *United*

---

of the contractors' campaign cash was donated to lawmakers within a year of their contracts getting approved," often "months and weeks ahead of when the contracts were voted on" or even the same day as the vote).

*States v. Cunningham*, No. 3:05-cr-2137 (S.D. Cal. Nov. 28, 2005). Nor would the myriad of other instances of corruption and self-dealing in the contract bidding process have occurred. *See generally* DEP'T OF DEFENSE, ENCYCLOPEDIA OF ETHICAL FAILURE 4-58, 77-78, 82, 84-88, 132-46. Moreover, those facts are hardly surprising. Although agencies do rely on specialized contracting officers to help ensure independence, contracting officers in turn rely on information about needs and objectives provided by the "customer" agency, which may include input from political appointees. *See* D. Ct. Findings ¶ 23 (citing Schooner Dep. 110-16). And Members of Congress have many opportunities of their own to intercede on behalf of their constituents. *See, e.g.*, MORTON ROSENBERG & JACK H. MASKELL, CONG. RESEARCH SERV., CONGRESSIONAL INTERVENTION IN THE ADMINISTRATIVE PROCESS: LEGAL AND ETHICAL CONSIDERATIONS 80 (2003); H.R. REP. NO. 113-666, at 4 (2014).

Second, most contracts held by individuals to provide personal services on a regular basis, such as those held by plaintiffs Brown and Miller, "'are not . . . . subject to full and open competition and the full range of rights and responsibilities that follow.'" D. Ct. Findings ¶ 24 (quoting Schooner Dep. 89); *see* 48 C.F.R. § 13.003(d). Nor is full-blown competitive bidding required for contracts with values below the "simplified acquisition threshold" -- set at $150,000 in most cases, 48 C.F.R. § 2.101. *See* 41 U.S.C. § 1901; 48 C.F.R. § 13.003(a). Instead, "'the government can call two or three people on the phone and operate in a very informal manner.'" D. Ct. Findings ¶ 24 (quoting Schooner Dep. 107-08). Wagner's contract, for example, was arranged under the simplified acquisition procedures. *Id.* She was proactively approached by a staff member at ACUS, and then discussed the arrangement with ACUS's Chairman, who is appointed by the President and confirmed by the Senate. Wagner Decl. ¶ 3. In short, because

the plaintiffs challenge § 30119 as it applies to individual contractors, the competitive bidding regime does little to help their case.

Finally, perhaps the most relevant change in government contracting over the past several decades has been the enormous increase in the government's reliance on contractors to do work previously performed by employees. *See* Schooner Dep. 35-36, *cited in* D. Ct. Findings ¶ 22.[22] If anything, that shift has only strengthened the original rationales for the contractor contribution ban by increasing the number of potential targets of corruption and coercion -- targets who do not have the merit system protections available to government employees. *See* 5 U.S.C. §§ 1214-15, 2301(b)(1)-(2); *infra* Part V.B.[23]

_____

[22]*See also* Test. of John K. Needham, Director, Acquisition & Sourcing Management, Gov't Accountability Office, S. Hrg. 111-626, at 3 (2010) ("[I]t is now commonplace for agencies to use contractors to perform activities historically performed by government employees."); Presidential Memorandum for the Heads of Executive Departments and Agencies on Government Contracting, Mar. 4, 2009 (noting that spending on government contracts had more than doubled since 2001 and that the line between traditional public functions and contracting functions "has been blurred and inadequately defined"); PAUL C. LIGHT, RESEARCH BRIEF: THE NEW TRUE SIZE OF GOVERNMENT 1 (2006) (noting that the Bush Administration "has overseen the most significant increase in recent history in the largely hidden workforce of contractors and grantees who work for the federal government").

[23]Increased reliance on individual contractors -- particularly retirees such as Brown and Miller -- also raises a concern that some former federal employees may unwittingly violate § 30119 because they are unaware that they have become subject to a different set of restrictions as contractors. However, as FEC counsel advised the court, there is no criminal violation unless the individual knows his or her conduct violates the law. Oral Arg. Recording 1:01:19-1:02:19;

2. The plaintiffs also question whether there is sufficient evidence of corruption or coercion specifically with respect to individual contractors, as compared to those organized as corporations or other kinds of firms. It is true that most of the examples set forth in Parts III.B and III.C above involve firms.[24] We see no reason, however, to believe that the motivations for corruption and coercion exhibited in those examples are inapplicable in the case of individual contractors. Consider Sam Harris, a consultant who told the Watergate Committee that "he was made to feel that his continued success in obtaining Government contracts would, in significant degree, be dependent on his contributing to the President's reelection." WATERGATE REPORT at 409. There is no basis for thinking that Harris would have been less vulnerable to such coercion if, instead of doing business as Sam Harris & Associates, *id.*, he had contracted with the government in his personal capacity. We are also mindful that less direct evidence is required when, as here, the government acts to prevent offenses that "are successful precisely because they are difficult to detect." *Burson*, 504 U.S. at 208 (upholding restriction of campaign

*see* 52 U.S.C. § 30109(d)(1)(A) (imposing criminal penalties on those who "knowingly and willfully" violate FECA); *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) ("[I]n order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." (internal quotation marks omitted)).

[24]*But see, e.g.*, 84 CONG. REC. 9598, 9610 (1939) (statements of Reps. Taylor and Michener) (detailing the coercion of WPA-paid workers to contribute to the Democratic Party that led to passage of the Hatch Act); WATERGATE REPORT at 413 (describing how federal employees were pressured to help meet a "management objective" by contributing to a Republican Party fundraiser); *id.* 429 (describing evidence that contributions were solicited from Veterans' Administration employees).

speech near voting places as warranted to prevent "[v]oter intimidation and election fraud," notwithstanding limited record evidence). "[N]o smoking gun is needed where . . . the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic." *Blount v. SEC*, 61 F.3d 938, 945 (D.C. Cir. 1995).

Moreover, the trend we identified above, toward a larger federal workforce outside the protection of the civil service system, necessarily poses an increased threat of both corruption and coercion. If anything, past experience suggests that such workers are particularly vulnerable to tacit (or not so tacit) demands for political tributes. *See, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 66 (1990) (describing state government promotion decisions predicated on "whether the applicant has provided financial or other support to the Republican Party and its candidates"); *Elrod*, 427 U.S. at 355 (describing Cook County patronage system in which, "[i]n order to maintain their jobs, respondents were required to . . . contribute a portion of their wages to the [Democratic] Party"); *see also Umbehr*, 518 U.S. at 671 (describing an individual whose contract for hauling trash allegedly was terminated in retaliation for political criticism). A coercive patronage system can thrive on even small contributions from a large group of workers beholden to those in power -- which is what the growing ranks of individual contractors staffing federal agencies offer. As the Court explained in *Elrod v. Burns*, "[a]s government employment . . . becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and otherwise." 427 U.S. at 356; *see Letter Carriers*, 413 U.S. at 565-66 (explaining that "perhaps the immediate occasion for enactment of the Hatch Act in 1939 . . . was the conviction that the rapidly expanding

Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine").

E

Our historical review makes clear that the two Court-approved justifications for limitations on campaign activities -- to protect against quid pro quo corruption and its appearance, and to protect merit-based public administration -- were the justifications that lay behind the contractor contribution statute. Likewise, our national experience supports Congress' fear that political contributions by government contractors can corrupt and interfere with merit-based administration.

The Supreme Court has instructed that the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). There is nothing novel or implausible about the notion that contractors may make political contributions as a quid pro quo for government contracts, that officials may steer government contracts in return for such contributions, and that the making of contributions and the awarding of contracts to contributors fosters the appearance of such quid pro quo corruption. Nor is there anything novel or implausible about the idea that contractors may be coerced to make contributions to play in that game, or that more qualified contractors may decline to play at all if the game is rigged. To the contrary, the empirical record is more than sufficient to satisfy the heightened judicial scrutiny appropriate for review of the legislative judgments that support § 30119.

In sum, the interests supporting the contractor contribution statute are legally sufficient, and the dangers it seeks to combat are real and supported by the historical and factual record.

Accordingly, we now turn to the remainder of the "closely drawn" test.

## IV

Even if a contribution ban serves sufficiently important interests, to satisfy the First Amendment it still must employ "'means closely drawn to avoid unnecessary abridgment of associational freedoms.'" *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 25). Clearing this hurdle "require[s] 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served[;] . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.'" *Id.* at 1456-57 (quoting *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989)). The plaintiffs contend that § 30119 fails this test because it is overinclusive in several respects, which we consider in turn.

## A

The plaintiffs first maintain that the statute is overinclusive because Congress banned their contributions entirely, rather than simply resting on the contribution limits generally applicable to all citizens, *see* 52 U.S.C. § 30116(a), or on some more modest limits. Such a contribution ban, applicable to a particular category of persons, is not unique. Federal law has long prohibited all federal campaign contributions by corporations and labor unions. *See* 52 U.S.C. § 30118(a); *Beaumont*, 539 U.S. at 161-63. Several states have their own bans on certain contributions by classes of individuals or firms that do business

with the government.[25]  And every judge on this court -- indeed, on every lower federal court -- is likewise banned from making political contributions.  *See* CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon 5(A)(3).  So, too, are judicial employees. *See* CODE OF CONDUCT FOR JUDICIAL EMPLOYEES § 310.10(a); *id*. § 320, Canon 5(A).  *See also Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) (three-judge court) (upholding ban on contributions by foreign nationals, 52 U.S.C. § 30121(a)), *summ. aff'd*, 132 S. Ct. 1087 (2012).

　　We do not dispute that the total ban on federal contributions by contractors is a significant restriction.  But the point of the "closely drawn" test is that "'[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.'"  *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 25).  And we conclude that the ban at issue here is permissible in the circumstances that we address in this opinion:  a regulation that bars only campaign contributions and that is imposed only on government contractors.  As we have discussed, the Court has held that campaign contributions constitute a form of expressive activity less central to the First Amendment than other kinds of political activity and expenditures.  *See, e.g.*, *id.* at 1444; *Beaumont*, 539 U.S. at 161; *Buckley*, 424 U.S. at 25.  And as we have also discussed, we owe "'greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.'"  *Umbehr*, 518 U.S. at 676

---

[25]*See, e.g.*, CONN. GEN. STAT. § 9-612(f)(1)-(2); HAW. REV. STAT. § 11-355; 30 ILL. COMP. STAT. 500/50-37; IND. CODE §§ 4-30-3-19.7; LA. REV. STAT. ANN. § 18:1505.2(L); MICH. COMP. LAWS § 432.207b; W. VA. CODE § 3-8-12(d).

(quoting *Waters*, 511 U.S. at 673); *see Letter Carriers*, 413 U.S. at 566-67; *Pickering*, 391 U.S. at 568. Under these circumstances, we conclude that Congress' decision to impose a contribution *ban* during the period of contract negotiation and performance is closely drawn for two reasons.

First, the contracting context greatly sharpens the risk of corruption and its appearance. Unlike the corruption risk when a contribution is made by a member of the general public, in the case of contracting there is a very specific quo for which the contribution may serve as the quid: the grant or retention of the contract. Indeed, if there is an area that can be described as the "heartland" of such concerns, the contracting process is it. *Cf. Green Party*, 616 F.3d at 202 (explaining that Connecticut's ban on contractor contributions "is, without question, 'closely drawn' to meet the state's interest in combating corruption and the appearance of corruption" because such contributions "lie at the heart of the corruption problem in Connecticut"); *see also Yamada*, 2015 WL 2384944, at *20. The long historical experience described in Parts III.B and III.C makes clear that this is not just a question of risk, but of reality.

Moreover, because of that sharpened focus, the appearance problem is also greater: a contribution made while negotiating or performing a contract looks like a quid pro quo, whether or not it truly is. As the sponsor of the 1940 contractor contribution ban explained to his Senate colleagues, the ban was needed because contractor contributions "may be considered in some instances as bribery in order to secure governmental contracts," 86 CONG. REC. 2982 (1940) (statement of Sen. Byrd). *See Green Party*, 616 F.3d at 205 (upholding Connecticut's ban because, inter alia, "[e]ven if small contractor contributions would have been unlikely to influence state officials, those contributions could have still given rise to the appearance that contractors are able to exert improper influence

on state officials"); *cf. Preston*, 660 F.3d at 736 (upholding North Carolina's ban on lobbyists' contributions because it rested on "a legitimate legislative judgment" that "a complete ban was necessary as a prophylactic to prevent not only actual corruption but also the appearance of corruption in future state political campaigns").

Second, the contracting context also greatly sharpens the risk of interference with merit-based public administration. Because a contractor's need for government contracts is generally more focused than a member of the general public's need for other official acts, his or her susceptibility to coercion is concomitantly greater. And coercing a contractor to contribute, even if limited by a contribution ceiling, is still coercion.

In sum, we conclude that a flat prohibition is closely drawn to the important goals that § 30119 serves. *Cf. Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1672 (2015) ("Although the Court has held that contribution limits advance the interest in preventing *quid pro quo* corruption and its appearance in political elections, we have never held that adopting contribution limits precludes a State from pursuing its compelling interests through additional means.").

B

The plaintiffs also argue that § 30119 is overinclusive because it bans contributions not only to candidates for President and Congress, but also to political parties, which, "[u]nlike elected officials who might have the theoretical power to influence a contract, . . . plainly have no ability to affect the award of any contract." Pls. Br. 51. But the Democratic campaign book scandal of the 1930s gave Congress sufficient reason to target contributions to parties: it was the Democratic

National Committee whose agents reportedly told government contractors that the continuation of their contracts hinged on their financial support of the party. *See* 84 CONG. REC. 9598-99 (1939). Indeed, the 1876 law concerning federal employees was also "aimed at the suppression of the practice which has prevailed among *party organizations* of soliciting contributions for *party purposes* from their office-holding members, or exacting them by a moral coercion." *United States v. Curtis*, 12 F. 824, 838 (C.C.S.D.N.Y. 1882) (emphasis added). Likewise the Watergate Committee's report on the 1972 election included evidence that federal employees were pressured to contribute to the Republican Party. WATERGATE REPORT at 413. Nor did the role of contributions to political parties in influencing government employment wane as the 20th century progressed. *See, e.g.*, *Elrod*, 427 U.S. at 351-52 (1976); *Branti v. Finkel*, 445 U.S. 507, 510-11 (1980); *Rutan*, 497 U.S. at 66 (1990).

More recently, in upholding FECA's restrictions on soft-money contributions to political parties, the Supreme Court noted that "'[t]here is no meaningful separation between the national party committees and the public officials who control them.'" *McConnell*, 540 U.S. at 155 (quoting expert report cited in *McConnell v. FEC*, 251 F. Supp. 2d 176, 468-69 (D.D.C. 2003)). As a three-judge court in this district noted, "the [*McConnell*] Court suggested that federal officeholders and candidates may value contributions to *their national parties* -- regardless of how those contributions ultimately may be used -- in much the same way they value contributions to *their own campaigns*." *Republican Nat'l Comm.*, 698 F. Supp. 2d at 159,

*summ. aff'd*, 561 U.S. 1040 (2010).[26]  Congress did not sweep too broadly by designing § 30119 to address that fact.

C

In addition to those we have just considered, the plaintiffs propose a miscellany of further ways in which Congress could make § 30119 less restrictive.  We address only the more substantial of these.

First, the plaintiffs propose that the ban should at least exclude sole-source contracts for experts like plaintiff Wagner, particularly when it is the government that initiates the contact, "because the requirements to enter them are sufficiently rigorous" to address the risk of corruption.  Pls. Br. 53 n.9.  But the plaintiffs do not explain what those requirements are, or why they provide the requisite assurances.  *Cf.* KATE M. MANUEL, CONG. RESEARCH SERV., COMPETITION IN FEDERAL CONTRACTING: AN OVERVIEW OF THE LEGAL REQUIREMENTS 1 (2011) (noting "high-profile incidents of alleged misconduct by contractors or agency officials involving noncompetitive contracts").  Moreover, this argument appears contrary to the plaintiffs' principal contention, that it is the rise of competitive bidding -- not the private placement of sole-source contracts -- that has eliminated the risk of pay-to-play.  *See supra* Part III.D.1.  In any event, because Wagner's claims are moot, this argument need not detain us.

---

[26]*See McConnell*, 540 U.S. at 155 (explaining that the "close connection and alignment of interests" between parties and federal officeholders are likely to create the risk of "actual or apparent" corruption); *Emily's List v. FEC*, 581 F.3d 1, 6 (D.C. Cir. 2009).

Second, the plaintiffs argue that § 30119 unnecessarily bars contractors from contributing to ideological PACs that, in turn, contribute to candidates. Whether or not this argument has merit,[27] it suffers from a similar problem: the one plaintiff whose claim is not moot lacks standing to challenge limitations on contributions to PACs. *See supra* Part I.

Third, the plaintiffs suggest that the statute would be more closely drawn if it applied only to large contracts, pointing out that Colorado and New York City enacted pay-to-play laws limited to contracts worth more than $100,000. *See* Pls. Br. 52-53. Although such a dollar limit would of course reduce the number of covered contractors, the plaintiffs do not explain why § 30119 is not closely drawn to the interests it serves in the absence of such a limit, or why a dollar limit would draw it more closely to those interests. Perhaps quid pro quos and coercion are more likely when larger contracts are involved because, since more money is at stake, the parties are more willing to risk detection and prosecution. Or perhaps such abuses are just as likely when smaller contracts are involved because the relative value to the small contractor is high and the risk of detection is comparatively low. Because the plaintiffs have advanced no argument on this point, there is no need for us to speculate further. We do note, however, that the historical record provides support for legislative concern that corrupt and coercive patronage regimes can take root even when relatively small amounts of money are at stake. *See supra* Parts III.B.1-2, III.D.2., IV.A. And we also note again that a contribution ban need not be a perfect fit to be constitutional, *see McCutcheon*,

---

[27]The Supreme Court has upheld restrictions on contributions to multicandidate committees as a necessary means to avoid circumvention of other limits. *Cal. Med. Ass'n*, 453 U.S. at 197-99 (plurality opinion); *see id.* at 203 (Blackmun, J., concurring in part and concurring in the judgment); *Emily's List*, 581 F.3d at 11-12.

134 S. Ct. at 1456-57, and that courts give substantial deference to the government's predictions of harm concerning its own employees and contractors, *see Umbehr*, 518 U.S. at 676.

Finally, the plaintiffs maintain that Congress should have rested on the criminal statutes that directly ban quid pro quos and coercion,[28] rather than also banning political contributions. But the Supreme Court has repeatedly dispatched this argument. As *McConnell* explained, "[i]n *Buckley*, we expressly rejected the argument that antibribery laws provided a less restrictive alternative to FECA's contribution limits, noting that such laws 'deal[t] with only the most blatant and specific attempts of those with money to influence governmental action.'" 540 U.S. at 143 (quoting *Buckley*, 424 U.S. at 28); *see Citizens United*, 558 U.S. at 356-57 (noting that, although quid pro quo arrangements "would be covered by bribery laws" if proven, the Court has viewed "restrictions on direct contributions a[s] preventative" and has sustained them "in order to ensure against the reality or appearance of corruption"). And what is true of the antibribery laws is equally true of the anticoercion provisions. *See Letter Carriers*, 413 U.S. at 566 ("It may be urged that prohibitions against coercion are sufficient protection; but for many years the joint judgment of the Executive and Congress has been that to protect the rights of federal employees with respect to their jobs and their political acts and beliefs it is not enough merely to forbid one employee to attempt to influence or coerce another.").

---

[28] *See, e.g.*, 18 U.S.C. § 201 (proscribing bribes and gratuities); *id.* § 601 (proscribing causing or attempting to cause persons to make political contributions by denying or threatening to deny them work in or for the federal government).

45

D

Because the operative question in the plaintiffs'
overinclusiveness challenge is whether § 30119 avoids
"unnecessary abridgment" of First Amendment rights, it is also
important to consider how much the statute leaves untouched.
Campaign contributions are banned, but other forms of political
engagement are left entirely unrestricted. The plaintiffs are free
to volunteer for candidates, parties, or political committees; to
speak in their favor; and to host fundraisers and solicit
contributions from others. *See* 52 U.S.C. § 30101(8)(B)
(enumerating activities to which the term "contribution" does
not extend). And even the contribution ban itself is limited to
the period between commencement of negotiations and
completion of contract performance. *Id.* § 30119(a)(1).

The plaintiffs insist that the fact that the statute preserves
other avenues of political communication is irrelevant to First
Amendment analysis. Pls. Br. 61. But that argument is
incorrect. As the Court recognized in *McCutcheon v. FEC*, "in
the context of [upholding the] base contribution limits, *Buckley*
observed that a supporter could vindicate his associational
interests by personally volunteering his time and energy on
behalf of a candidate." *McCutcheon*, 134 S. Ct. at 1449 (citing
*Buckley*, 424 U.S. at 22, 28).[29] The availability of other avenues

---

[29]*See Buckley*, 424 U.S. at 22 (noting that FECA's contribution
ceilings "limit one important means of associating with a candidate or
committee, but leave the contributor free to become a member of any
political association and to assist personally in the association's efforts
on behalf of candidates"); *see also Williams-Yulee*, 135 S. Ct. at 1670
(upholding Florida's ban on solicitation of campaign funds by judicial
candidates, emphasizing that the ban restricts only "a narrow slice of
speech" because it "leaves judicial candidates free to discuss any issue
with any person at any time").

of political communication can thus be relevant, although it is of course not dispositive.

In *Blount v. SEC*, for example, this court upheld a rule restricting political contributions by municipal finance professionals to state and local officials from whom they hoped to secure underwriting contracts. 61 F.3d 938. We found the rule to be "closely drawn," in part because it "restrict[ed] a narrow range of their activities for a relatively short period of time," and those subject to the rule were "not in any way restricted from engaging in the vast majority of political activities." *Id*. at 947-48. Similarly, the Fourth Circuit upheld a lobbyist contribution ban in part because it "serve[d] only as a channeling device, cutting off the avenue of association and expression that is most likely to lead to corruption but allowing numerous other avenues of association and expression." *Preston*, 660 F.3d at 734. So, too, here.

E

We conclude that the ban on contractor contributions is closely drawn to the government's interests in preventing corruption and its appearance, and in protecting against interference with merit-based administration. It strikes at the dangers Congress most feared while preserving contractors' freedom to engage in many other forms of political expression. We do not discount the possibility that Congress could have narrowed its aim even further, targeting only certain specific kinds of government contracting or doing so only during specific periods. But as the Court has made clear, "most problems arise in greater and lesser gradations, and the First Amendment does not confine a State to addressing evils in their most acute form." *Williams-Yulee*, 135 S. Ct. at 1671.

V

What we have said thus far establishes that § 30119's ban on contractor contributions serves sufficiently important interests and employs means closely drawn to avoid unnecessary abridgment of protected expression. The plaintiffs make one further First Amendment argument: not only is § 30119 *over*inclusive because it *restricts* too much speech, but it is also *under*inclusive because it *permits* too much speech. That is, it fails to ban contributions by three categories of individuals or entities that might implicate the same interests.

The first category proffered for comparison by the plaintiffs consists of entities and individuals associated with firms that have government contracts: PACs established by contracting corporations; officers, employees, and shareholders of contracting corporations; and individuals who control limited liability companies (LLCs) that contract with the federal government. The second category is composed of federal employees. The final category comprises individuals who seek other government benefits or positions, particularly grants and loans, admission to the military academies, and ambassadorships.[30]

We begin with some general principles relevant to evaluating a claim that a statute violates the First Amendment because it is "underinclusive." To put it most bluntly: "The First

---

[30]The plaintiffs' opening brief proffers only the third category as an example of First Amendment underinclusiveness, discussing the first two as part of their equal protection challenge. Pls. Br. 23, 55-59. In their reply brief, the plaintiffs identify all three categories as supporting their First Amendment argument. Reply Br. 26-28. Because the issues are intertwined, *see infra* Part VI, we consider all three categories here.

Amendment does not require the government to curtail as much speech as may conceivably serve its goals." *Blount*, 61 F.3d at 946. Or, as the Supreme Court recently said in *Williams-Yulee v. Florida Bar*, in which it upheld, under strict scrutiny, Florida's ban on solicitation of campaign funds by judicial candidates:

> [T]he First Amendment imposes no freestanding "underinclusiveness limitation." A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws -- even under strict scrutiny -- that conceivably could have restricted even greater amounts of speech in service of their stated interests.

135 S. Ct. at 1668 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). Of course, in the instant case we do not apply strict scrutiny, but rather the more forgiving "closely drawn" standard. And a statute that does not go as far as it might to cut off campaign contributions can hardly be said to constitute an "unnecessary abridgment" of the freedom to make such contributions, *McCutcheon*, 134 S. Ct. at 1444.

This is not to say that underinclusiveness plays no role in First Amendment analysis. As the Court explained in *Williams-Yulee*, a law's underinclusiveness raises "a red flag" that may indicate a different kind of problem. 135 S. Ct. at 1668. For example, it may raise "'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Id.* (quoting *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2740 (2011)). The "textbook illustration of that principle," the Court explained, is the *Lukumi Babalu Aye* case, in which it struck down a city's ban on ritual animal sacrifices because the city's failure to ban secular

killings indicated that the ban's object was not (as it asserted) animal welfare but rather the suppression of particular religious beliefs. *Williams-Yulee*, 135 S. Ct. at 1668 (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 543-47 (1993)).[31] Indeed, underinclusiveness may call into question whether "the proffered state interest actually underlies the law," *Blount*, 61 F.3d at 938 (internal quotation marks omitted), even when the true interest is not invidious. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (finding a restriction on speech by judicial candidates "so woefully underinclusive as to render belief in [its asserted] purpose a challenge to the credulous").[32]

---

[31]*See also City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (noting that "a regulation of speech may be impermissibly *underinclusive*" if it represents an attempt "to give one side of a debatable public question an advantage in expressing its views to the people," or "to select the permissible subjects for public debate and thereby to control . . . the search for political truth" (internal quotation marks omitted)); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 793 (1978) (finding an underinclusiveness problem where "[t]he fact that a particular kind of ballot question [was] singled out for special treatment . . . suggest[ed] . . . that the legislature may have been concerned with silencing corporations on a particular subject").

[32]*See also Citizens United*, 558 U.S. at 362 (concluding that, "if Congress had been seeking to protect dissenting shareholders" as the government claimed, it would not have banned corporate speech "in only certain media" for only a specific period before an election); *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (invalidating statute barring publication of victims' identities in part because its "facial underinclusiveness . . . raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which [it] invokes in support of affirmance").

But the plaintiffs do not challenge § 30119 on these grounds. They do not contend, for example, that Congress' true interest was to favor corporate affiliates, federal employees, or government grantees over individual contractors, *see* Oral Arg. Recording 18:20-19:03, which would require us to undertake closer analysis of the basis for such disparate treatment. To the contrary, they agree that the interests that motivated and have sustained § 30119 are the anticorruption goals the government invokes today. *See id.* 22:05-45. Moreover, it is plain that the statute "applies evenhandedly to all [government contractors], regardless of their viewpoint," *Williams-Yulee*, 135 S. Ct. at 1668, and regardless of their form of organization, *see* 52 U.S.C. § 30119(a)(1) (barring the "person" who enters into the contract from making the contribution); *id.* § 30101(11) (defining "person" to "include[] an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons"). And nothing in the statute's history even hints at any purpose to disfavor individual contractors as against the categories proffered by the plaintiffs.

In *Williams-Yulee*, the Court noted that "[u]nderinclusiveness can also reveal that a law does not actually advance a compelling interest." 135 S. Ct. at 1668. *See also Blount*, 61 F.3d at 946 (noting that a rule may be "struck for *under*inclusiveness . . . if it cannot 'fairly be said to advance any genuinely substantial governmental interest'" (quoting *FCC v. League of Women Voters*, 468 U.S. 364, 396 (1984))). As an example of that kind of case, the Court cited the facts of *Smith v. Daily Mail*, where the Court struck down a state statute banning newspapers from disclosing the names of juvenile defendants because, inter alia, the statutory purpose -- protecting the anonymity of juvenile offenders -- was entirely vitiated by the statute's failure to bar electronic media from making the same disclosures. *Williams-Yulee*, 135 S. Ct. at 1668 (citing

*Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104-105 (1979)).[33] But here, the record reflects that § 30119 does advance, albeit imperfectly, the government's important interests in protecting against quid pro quo corruption and its appearance, and in protecting merit-based public administration.

With these general principles in mind, we now briefly examine each of the categories of underinclusiveness to which the plaintiffs draw our attention.

A

The plaintiffs' first category includes entities and individuals associated with corporations that have government contracts. Like the plaintiffs, corporations that contract with federal agencies cannot make contributions in federal elections. *See* 52 U.S.C. §§ 30119(a), 30101(11).[34] At the same time, it is true that corporate contractors (like other corporations) are permitted to form PACs -- separate segregated funds that can

---

[33]*Cf. Reed v. Town of Gilbert*, No. 13-502, 2015 WL 2473374, at *11 (U.S. June 18, 2015) (holding that a town's content-based sign regulation failed strict scrutiny because "[t]he Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem"); *Sanjour v. EPA*, 56 F.3d 85, 95 (D.C. Cir. 1995) (en banc) ("Because the government has . . . not even attempted to regulate a broad category of behavior . . . giving rise to precisely the harm that supposedly motivated it to adopt the [challenged] regulations, we have trouble taking the government's avowed interest to heart.").

[34]The ban on corporate contractor contributions is a consequence not only of § 30119, but also of 52 U.S.C. § 30118, which bans contributions by any corporation in a federal election. *See Beaumont*, 539 U.S. 146 (upholding the ban on corporate contributions).

make campaign contributions with non-treasury funds solicited from shareholders, certain personnel, and their families. *See* 52 U.S.C. § 30119(b); *id.* § 30118(b). Officers, employees, and shareholders of corporate contractors are also free to make direct contributions "from their personal assets." 11 C.F.R. § 115.6. And it may be that individuals who control LLCs that contract with the federal government can make contributions as well. But none of these allowances fatally undermines the statutory regime.

1. A corporation is a separate legal entity from a PAC. *See Citizens United*, 558 U.S. at 337; *Mass. Citizens for Life*, 479 U.S. at 252-56. As a consequence, the Supreme Court has said that the political expression of a PAC is not equivalent to that of its associated corporation. *See Citizens United*, 558 U.S. at 337 ("A PAC is a separate association from the corporation. So the PAC exemption from [FECA's] expenditure ban does not allow corporations to speak." (citation omitted)). Congress' decision to permit contributions by PACs associated with contracting corporations is therefore not inconsistent with its decision to prohibit contributions by contractors themselves.

In *Williams-Yulee*, the Court considered a similar underinclusiveness challenge to Florida's ban on personal solicitation of campaign funds by judicial candidates. That ban "allow[ed] a judge's campaign committee to solicit money," which the petitioner argued "reduces public confidence in the integrity of the judiciary just as much as a judge's personal solicitation." 135 S. Ct. at 1668. The Court was not moved. "However similar the two solicitations may be in substance," the Court said, "a State may conclude that they present markedly different appearances to the public. Florida's choice to allow solicitation by campaign committees does not undermine its decision to ban solicitation by judges." *Id.* at 1669. The same can be said of Congress' choice to permit contributions by

political committees associated with corporate contractors, while banning contributions by contractors themselves.

2. Respecting the corporate form, and therefore according separate treatment to shareholders and other individuals associated with corporations, is also constitutional. In *Blount*, we considered and rejected a similar underinclusiveness challenge to the SEC's pay-to-play rule, which, while restricting contributions by municipal securities professionals, did not extend the restriction to the chief executives of banks with municipal securities departments. "[A] regulation is not fatally underinclusive," we said, "simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective." *Blount*, 61 F.3d at 946.

In upholding the SEC's rule, *Blount* also noted the SEC's explanation that this "loophole," like others in the rule, reflected the Commission's sensitivity to First Amendment concerns about overinclusiveness. *Id.* at 947. Here, too, Congress could reasonably have concluded that banning contributions by all those associated with corporate contractors would go too far at too great a First Amendment cost.

3. The plaintiffs further argue that, while they contract directly with the federal government for their services and so are barred from making contributions, they or other individuals could instead establish an LLC to formally contract with the government and receive payment for their work. Then, because the FEC has ruled that the contractor contribution ban does not apply to an entity's "employees, officers, or members," 11 C.F.R. § 115.6, the plaintiffs maintain that such individuals would remain free to make contributions. The availability of this LLC loophole, they say, vitiates the statutory purpose.

Although the FEC's briefs accepted the plaintiffs' description of the regulatory treatment of individuals who establish LLCs, the agency submitted a post-argument letter clarifying that the Commission itself "has not addressed the application of FECA's contractor contribution prohibition to contributions made by an individual who is the sole member of an LLC that is a federal contractor." FEC Post-Argument Letter at 6 (Nov. 24, 2014) (emphasis omitted).[35] Perhaps for that reason, there is no evidence in the record that anyone has ever used an LLC as a loophole to permit him or her to make an individual campaign contribution.[36]

The plaintiffs' own evidence highlights the not insignificant costs involved in both establishing and operating as an LLC. *See* Tiemann Decl. ¶ 3, *cited in* D. Ct. Findings ¶ 19. Moreover, at oral argument, plaintiffs' counsel acknowledged that "persons like Mr. Miller and Mr. Brown almost certainly could not have [contracted] through [an] LLC" -- both because the agency may not have allowed it, and because of the "substantial sacrifice" they would have incurred by forgoing various benefits that come with employment-like contracts. Oral Arg. Recording 23:13-58. In short, in the absence of any evidence of circumvention-by-LLC, the failure to plug this speculative loophole is hardly a

[35]The statute, of course, does not mention LLCs, which first emerged in the late 1970s. *See* Treatment of Limited Liability Companies Under the Federal Election Campaign Act, 64 Fed. Reg. 37397, 37398 (July 12, 1999).

[36]One witness opined that, at least with respect to consulting-type contracts, client agencies are indifferent between contracting with an LLC and contracting with an individual. *See* Schooner Decl. ¶ 8, *cited in* D. Ct. Findings ¶ 20. The witness did not say how many such arrangements there are, or that any individuals using LLCs had actually made campaign contributions. *Id.*; *see also* Lubbers Decl. ¶ 8, *cited in* D. Ct. Findings ¶ 20.

basis for invalidating the statute. *Cf. Williams-Yulee*, 135 S. Ct. at 1670 ("Even under strict scrutiny, '[t]he First Amendment does not require States to regulate for problems that do not exist.'" (quoting *Burson*, 504 U.S. at 207)).

B

The second category proffered by the plaintiffs as evidence of § 30119's underinclusiveness is composed of federal employees who, unlike federal contractors, are generally not barred from making campaign contributions. *See* 5 C.F.R. § 734.208(a). As with the other categories, there is no ground for concluding that Congress chose to invidiously discriminate against contractors in favor of employees. And while federal employees are permitted to make contributions, they are subject to other restrictions (pursuant to the Hatch Act) and enjoy other protections (pursuant to the Civil Service Reform Act) that do not apply to contractors.[37]

---

[37]The Hatch Act bars most federal employees from, inter alia, soliciting or accepting political contributions, running for office in a partisan election, hosting a political fundraiser, or engaging in political activity while on duty or in a federal building. *See* 5 U.S.C. §§ 7323(a), 7324(a); 5 C.F.R. §§ 734.302-.306. Employees of more than a dozen specific agencies, as well as others who hold certain senior or adjudicative positions, are more broadly prohibited from "tak[ing] an active part in . . . political campaigns." 5 U.S.C. § 7323(b)(2)(A). Under the Civil Service Reform Act, covered employees are protected against "prohibited personnel practices," including discrimination on the basis of political affiliation and coercion to make political contributions. 5 U.S.C. § 2302(a)(1), (b)(1)(E), (b)(3). Aggrieved employees who have been subjected to such practices can seek redress through the Office of Special Counsel and the Merit Systems Protection Board. 5 U.S.C. §§ 1214-15, 1221.

Congress could reasonably have thought that the difference in status of the two kinds of workers warrants this difference in treatment. Because regular employees do not generally need new contracts or renewals with the frequency required by outside contractors, permitting them to make contributions carries less risk of corruption or its appearance: employees have less to gain from making contributions and less to lose from not making them.[38] It is true, as the plaintiffs note, that employees have other concerns that could make them susceptible to coercion, including the desire for promotion or the fear of termination. But Congress has provided them with merit system protections that guard against that risk. *See supra* note 37. We see no basis for overturning Congress' decision about how to calibrate these different restrictions.[39]

## C

Finally, the plaintiffs' comparison of contractors to a miscellany of other individuals who seek government benefits or positions -- particularly grants and loans, admission to the military academies, and ambassadorships -- is equally

---

[38]*Cf.* 86 CONG. REC. 2580 (1940) (statement of Sen. Brown) ("[T]he Government clerk, *if he is not under civil service*, is interested in keeping in power the party that is in power and that gave him a job. . . . I can apply the same principle . . . . to contractors who are doing business with the Government of the United States." (emphasis added)).

[39]*Cf. Broadrick v. Oklahoma*, 413 U.S. 601, 607 n.5 (1973) (rejecting equal protection challenge to Oklahoma statute "singling out classified service employees for restrictions on partisan political expression while leaving unclassified personnel free from such restrictions" because "the legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated").

unavailing. Once again, there is no basis for a claim that Congress invidiously discriminated against contractors and in favor of others. Nor is there any reason to believe that permitting contributions by these other individuals defeats § 30119's purpose of protecting against corruption and interference with merit-based administration. Congress is surely not prohibited from fighting such problems in one sector unless it fights them in all. As the Supreme Court has said, "'a legislature need not strike at all evils at the same time.'" *Buckley*, 424 U.S. at 105 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966)). Rather, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Id.* (internal quotation marks and citations omitted); *see Williams-Yulee*, 135 S. Ct. at 1668.

D

We conclude that the contractor contribution ban is not fatally underinclusive. There is no doubt that "the proffered state interest actually underlies the law," and that it can "fairly be said" that the statute "advance[s] a[] genuinely substantial governmental interest." *Blount*, 61 F.3d at 946 (citations and internal quotation marks omitted). The plaintiffs may well be right that the ban would be even more effective if it swept in more potential contributors. But § 30119 "aims squarely at the conduct most likely to undermine" the important interests that underlie it, and "[w]e will not punish [Congress] for leaving open more, rather than fewer, avenues of expression, especially when there is no indication that the selective restriction of speech reflects a pretextual motive." *Williams-Yulee*, 135 S. Ct. at 1668-70.

Accordingly, and in light of the analysis of the preceding Parts, we reject the plaintiffs' First Amendment challenge.

## VI

In addition to their First Amendment claim, the plaintiffs challenge § 30119 under the equal protection component of the Fifth Amendment. Equal protection is violated, they maintain, because the statute subjects individual contractors like themselves to a ban that it does not apply to two categories of similarly situated persons: (1) entities and individuals associated with firms that have government contracts (i.e., PACs of contracting corporations; officers, employees, and shareholders of contracting corporations; and individuals who control contracting LLCs); and (2) individuals who are regular employees rather than contractors.

If this argument sounds familiar, it should. It is the same argument that we have just considered, and rejected, when clothed in the garb of a First Amendment claim that § 30119 is too underinclusive to satisfy the "closely drawn" standard.[40] Now dressing their argument as an equal protection claim, the plaintiffs insist that we must evaluate it under strict scrutiny. That is so, they say, because "the right to make a political contribution is a fundamental right protected by the First Amendment," and because "strict scrutiny is required when a law . . . 'impinges upon a fundamental right explicitly or implicitly protected by the Constitution.'" Pls. Br. 25 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973)).

We reject this doctrinal gambit, which would require strict scrutiny notwithstanding the Supreme Court's determination that the "closely drawn" standard is the appropriate one under the

---

[40]As noted above, the plaintiffs' underinclusiveness argument included a third category as well: individuals seeking a miscellany of other government benefits or positions. *See supra* note 30.

First Amendment. Although the Court has on occasion applied strict scrutiny in examining equal protection challenges in cases involving First Amendment rights, it has done so only when a First Amendment analysis would itself have required such scrutiny.[41] There is consequently no case in which the Supreme Court has employed strict scrutiny to analyze a contribution restriction under equal protection principles. Indeed, the plaintiffs acknowledge that they know of no case in *any* court "in which an equal-protection challenge to contribution limits succeeded where a First Amendment one did not." *Wagner*, 901 F. Supp. 2d at 112. This will not be the first.

As we explained in *Ruggiero v. FCC*, "[a]lthough equal protection analysis focuses upon the validity of the classification rather than the speech restriction, 'the critical questions asked are the same.' We believe that the same level of scrutiny . . . is therefore appropriate in both contexts." 317 F.3d 239, 247 (D.C. Cir. 2003) (en banc) (quoting *Cmty.-Serv. Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102 (D.C. Cir. 1978) (en banc)).[42] That has been this court's consistent view. *See, e.g.*, *Int'l Ass'n of Machinists v. FEC*, 678 F.2d 1092, 1106 (D.C. Cir. 1982) (en banc) (observing that "the nature and quality of the legislative action at issue determine the intensity of judicial review of intertwined equal protection, First Amendment claims"); *see*

---

[41]*See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 655, 666 (1990) (applying strict scrutiny in determining whether restrictions on *independent expenditures* by corporations but not unincorporated associations passed muster under the Equal Protection Clause), *overruled on other grounds by Citizens United*, 558 U.S. at 365.

[42]In *Ruggiero*, that level of scrutiny was "heightened rational basis." 317 F.3d at 247.

*also Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 314 (3d Cir. 1999) (en banc).

It is certainly true that the Court "has occasionally fused the First Amendment into the Equal Protection Clause" in concluding that "content-based discrimination" is not a legitimate government interest because it "violates the First Amendment." *R.A.V.*, 505 U.S. at 384 n.4.[43] And it is likewise true that the Court has sometimes examined campaign finance classifications to determine whether they are invidious in the context of a First Amendment analysis, *see Williams-Yulee*, 135 S. Ct. at 1668-70, and sometimes in the context of an equal protection analysis, *see Buckley*, 424 U.S. at 31-33, 105 & n.143. But in a case like this one, in which there is no doubt that the interests invoked in support of the challenged legislative classification are legitimate, and no doubt that the classification was designed to vindicate those interests rather than disfavor a particular speaker or viewpoint, the challengers "can fare no better under the Equal Protection Clause than under the First Amendment itself." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 n.4 (1986).[44] For the reasons discussed in the

---

[43]*See City of Ladue*, 512 U.S. at 51 n.9 (observing that regulatory distinctions based on the content of speech "may fall afoul of the Equal Protection Clause"); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (observing that "the equal protection claim . . . is closely intertwined with First Amendment interests" when a classification discriminates on the basis of the content of speech); *see also Carey v. Brown*, 447 U.S. 455, 463 n.7 (1980) (describing *Mosley* as a "pronouncement that the First and Fourteenth Amendments forbid *discrimination* in the regulation of expression on the basis of the content of that expression" (emphasis added)).

[44]*Cf. Blount*, 61 F.3d at 946 & n.4 (concluding that the invalidity of an equal protection challenge to the SEC's pay-to-play rule followed a fortiori from the court's rejection of the claim that the rule

preceding Parts, when we apply the same degree of scrutiny to the plaintiffs' equal protection challenge, we find it wanting.

VII

As should by now be clear, this is a somewhat unusual campaign finance case in at least two respects. First, there is no dispute regarding the legitimacy or importance of the interests that support the contractor contribution ban. In § 30119, Congress was plainly not attempting "to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others." *McCutcheon*, 134 S. Ct. at 1441 (citing, e.g., *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2825-26 (2011)). Nor did it create a mechanism "to level the playing field, or to level electoral opportunities, or to equaliz[e] the financial resources of candidates." *Id.* at 1450 (internal quotation marks omitted). Nor did it "'disfavor[] a particular speaker or viewpoint,'" *Williams-Yulee*, 135 S. Ct. at 1668 (quoting *Brown*, 131 S. Ct. at 2740), or favor incumbents over challengers, *cf. Randall v. Sorrell*, 548 U.S. 230, 249, 253 (2006) (plurality opinion). To the contrary, the interests supporting the statute are ones that the Supreme Court has long approved -- indeed, endorsed -- as legitimate and important grounds for restricting campaign contributions and certain related associational freedoms.

Second, the contractor contribution ban rests on not one but two such interests. The ban is not only supported by the "compelling" interest in protecting against quid pro quo corruption and its appearance, *McCutcheon*, 134 S. Ct. at 1444-45, commonly at issue in campaign finance cases. It is also supported by the "obviously important interest[]" in protecting

violated the First Amendment as impermissibly underinclusive).

merit-based public administration, *Letter Carriers*, 413 U.S. at 564, commonly at issue in cases involving limits on partisan activities by government employees.

The long historical experience recounted in Part III further makes clear that these important concerns supporting § 30119 are neither theoretical nor antiquated, but rather are grounded in unhappy experience stretching to the present day. And for the reasons set forth in Parts IV through VI, we also conclude that the statute employs means closely drawn to avoid unnecessary abridgement of associational freedoms, and does not deprive the plaintiffs of equal protection of the laws. Accordingly, we uphold the statute against all of the plaintiffs' constitutional challenges.

*So ordered.*